THE EXECUTORS OF JOHN McDONOGH, DECEASED, AND OTHERS, *v.* MARY MURDOCH AND OTHERS, HEIRS OF JOHN McDONOGH, DECEASED.

McDonogh, a citizen of Louisiana, made a will, in which, after bequeathing certain legacies not involved in the present controversy, he gave, willed, and bequeathed all the rest, residue, and remainder of his property to the corporations of the cities of New Orleans and Baltimore forever, one half to each, for the education of the poor in those cities.

The estate was to be converted into real property, and managed by six agents, three to be appointed by each city.

No alienation of this general estate was ever to take place, under penalty of forfeiture, when the States of Maryland and Louisiana were to become his residuary devisees for the purpose of educating the poor of those States.

Although there is a complexity in the plan by which the testator proposed to effect his purpose, yet his intention is clear to make the cities his legatees; and his directions about the agency are merely subsidiary to the general objects of his will, and whether legal and practicable, or otherwise, can exert no influence over the question of its validity.

The city of New Orleans, being a corporation established by law, has a right to receive a legacy for the purpose of exercising the powers which have been granted to it, and amongst these powers and duties is that of establishing public schools for gratuitous education.

The civil and English law upon this point compared:

The dispositions of the property in this will are not "substitutions, or *fidei commissa,*" which are forbidden by the Louisiana code.

The meaning of those terms explained and defined:

The testator was authorized to define the use and destination of his legacy.

The conditions annexed to this legacy, the prohibition to alienate or to divide the estate, or to separate in its management the interest of the cities, or their care and control, or to deviate from the testator's scheme, do not invalidate the bequest, because the Louisiana Code provides that "in all dispositions *inter vivos* and *mortis causa*, impossible conditions, those which are contrary to the laws or to morals are reputed not written."

The difference between the civil and common law, upon this point, examined:

The city of Baltimore is entitled and empowered to receive this legacy under the laws of Maryland; and the laws of Louisiana do not forbid it. The article in the code of the latter State, which says that "Donations may be made in favor of a stranger, when the laws of his country do not prohibit similar dispositions in favor of a citizen of this State," does not most probably apply to the citizens or corporations of the States of the Union. Moreover, the laws of Maryland do not prohibit similar dispositions in favor of a citizen of Louisiana.

The destination of the legacy to public uses in the city of Baltimore, does not affect the valid operation of the bequest in Louisiana.

The cities of New Orleans and Baltimore, having the annuities charged upon their legacies, would be benefited by the invalidity of these legacies. Upon the question of their validity, this court expresses no opinion. But the parties to this suit, viz., the heirs at law, could not claim them.

In case of the failure of the devise to the cities, the limitation over to the States of Maryland and Louisiana would have been operative.

THIS was an appeal from the Circuit Court of the United States, for the Eastern District of Louisiana, sitting as a court of equity.

The bill was filed by the appellees, as the heirs at law of John McDonogh, to set aside his will.

The will itself is too long to be inserted in this report of the case; it would, of itself, occupy more than thirty printed pages. The reporter adopts the following statement of it, made out by

the following French jurists, whose opinion was requested upon the whole case, viz.: Coin-Delisle, Advocate, late of the Council of the Order of Advocates of Paris; Delangle, late Bastonier of the Order of Advocates of Paris; Giraud, LL.D., a member of the National Institute; Duranton, Père, Advocate, Professor in the Law Faculty of Paris; Marcadé, Advocate, late Advocate in the Court of Cassation.

### Statement of the facts of the case.

John McDonogh, a native of Baltimore, an inhabitant of McDonoghville, State of Louisiana, made his olographic will at McDonoghville aforesaid, on the 29th of December, 1838, according to the forms prescribed by the local law.

No question is raised about the form of the instrument; nor could it be otherwise. The Civil Code of Louisiana gives every man the right of making an olographic will. Such a will, in Louisiana, as in France, is one written by the testator himself; and, in order to be valid, it must be entirely written, dated, and signed by the testator's own hand. (Art. 1581.) This kind of will is subject to no other form, and may be made anywhere, even out of the State. (Same art.) These are the same rules as those contained in arts. 970 and 999 of the French Civil Code.

John McDonogh died in October, 1850. His will was proved in due form of law.

This will has been printed at New Orleans, at full length, with the testator's instructions appended, under the title of " The last Will and Testament of John McDonogh, late of McDonoghville, State of Louisiana; also his Memoranda of Instructions to his Executors, &c." We do not mean to give it here *in extenso,* deeming a synopsis of it quite sufficient for our purpose.

The testator, after having called on the holy name of God, commences, by declaring that he was never married, and that he has no heirs living, either in the ascending or the descending line. So that, according to the laws of the State, his power of willing away his property was unlimited. Civil Code of Louisiana, 1483.

He orders that, immediately after his death, an inventory shall be made of his property, by a notary public, assisted by two or more persons, whom his executors shall appoint; the same to be done on oath.

First comes a devise to the children of his sister Jane, the widow of Mr. Hamet, of Baltimore, of land which he purchased on the 29th of February, 1819, of one John Payne, in Baltimore county. This lot, containing ten acres, more or less, together with the improvements, goes to his nephews aforesaid, a life estate in the same being, however, reserved to their mother.

He also bequeathes to his said sister, widow Hamet, six thousand dollars, recommending to her so to place the capital as to make the interest support her in her old age.

He then bequeathes their freedom to certain slaves, fixes a fifteen years' term of service to be performed by certain others on his plantations, and orders the remainder of his black people to be sent to Liberia by the American Colonization Society.

And now, in language expressive of piety towards God, and charity towards mankind, the testator (after having made these deductions for his sister, Mrs. Hamet, for the children of his sister, and for the freedom of a certain number of slaves) goes on to lay down what may be called emphatically his will.

He gives, wills and bequeathes, all the rest, residue, and remainder of his estate, real and personal, present and future, as well that which is now his, as that which may be acquired by him hereafter, at any time previous to his death, and of which he may die possessed, of whatsoever nature it may be, and wheresoever situate, unto the Mayor, Aldermen and Inhabitants of New Orleans, his adopted city, and the Mayor, Aldermen and Inhabitants of Baltimore, his native city, and their successors forever, in equal proportions of one half to each of the said cities of New Orleans and Baltimore.

He wills, at the same time, that the entire mass of property thus bequeathed and devised, shall remain charged with several annuities or sums of money, to be paid by the devisees of his general estate, out of the rents of said estate.

He adds, that the legacies to the two cities are for certain purposes of public utility, and especially for the establishment and support of free schools in said cities and their respective suburbs, (including the town of McDonogh, as a suburb of New Orleans,) wherein the poor, and the poor only, of both sexes, of all classes and castes of color, shall have admittance, free of expense, for the purpose of being instructed in the knowledge of the Lord, and in reading, writing, arithmetic, history, geography, and singing, &c., &c.

This is the principal object of the testator's bounty, as appears by the words which usher in the general devise: "And for the more general diffusion of knowledge, and consequent well-being of mankind, convinced as I am, that I can make no disposition of these worldly goods which the Most High has been pleased so bountifully to place under my stewardship, that will be so pleasing to him, as that by which the poor will be instructed in wisdom, and led into the path of virtue and happiness, I give," &c.

For the execution of his will, and with the unequivocal intent of increasing his real estate, after his death, the testator appoints

executors, to whom he gives the seisin of all his personal estate, corporeal and incorporeal, and clothes them with the most extensive powers, without the interference of judicial or extra-judicial authority.

As relates to his real estate, such as it will be found to be at his death, which estate he has just devised to the cities of New Orleans and Baltimore, he expressly forbids the Mayor, Aldermen and Inhabitants of each of the cities, and their successors, ever to alienate or sell any part thereof; but the cities shall let the lots improved with houses, to good tenants, by the month or year; they shall let the unimproved lots in New Orleans, its suburbs, town of McDonogh, or elsewhere, for a term not to exceed twenty-five years at any one time, the rent payable monthly or quarterly, and to revert back, at the end of said time, with all the improvements thereon, free of cost, to the lessors; and, as to the lands, wherever situate, in the different parishes of the State, the cities shall lease them in small tracts, for a term not to exceed one to ten years, revertible back with their improvements, to be re-leased for a shorter time, and at higher rates.

As concerns his personal estate, (which, as we have seen in the general bequest above, also belongs to the cities of New Orleans and Baltimore,) the testator instructs his testamentary executors to invest his personal estate of all kinds, as well as the amount of all debts owing to him, as fast as they are received, together with the interest and increase, in real estate of a particular description, to wit: lots of ground, improved and unimproved, lying in the city or suburbs of New Orleans, and to hand over said real estate, with the title-deeds, to the commissioners and agents of his general estate, so that, by said means, the whole of his estate, real and personal, shall become a permanent fund on interest, as it were, (viz. a fund in real estate affording rents); no part of which fund shall ever be touched, divided, sold, or alienated, but shall forever remain together as one estate, termed in his will, "the general estate," and be managed, as hereinafter directed. The net amount of the revenues collected annually shall be divided equally, half and half, between the two cities of New Orleans and Baltimore, by the commissioners and agents of the general estate, after paying the several annuities and sums of money hereinafter provided for, and applied forever to the purposes for which it is intended.

The testator, dividing into eight equal portions the revenues of his estate, thus made up of the immovables left at his decease, and of those which shall be acquired by his executors, with the aid of his personalty and the interest accruing on his

credits, gives and bequeathes the first eighth part of the net yearly revenue of the whole, during forty years, to the American Colonization Society for colonizing the free people of color of the United States; but the society shall not receive or demand, in any one year, a larger sum than $25,000.

He gives and bequeathes the second eighth part of the net yearly revenue of the whole to the Mayor, Aldermen, and Inhabitants of the city of New Orleans, until said eighth part of the net yearly revenue of rents shall amount to the full and entire sum of $600,000; and that for the express and sole purpose of establishing an asylum for the poor of both sexes, and of all ages and castes of color.

He gives and bequeathes the third eighth part of the net yearly revenue of the whole to the Society for the Relief of Destitute Orphan Boys of New Orleans, for the express and sole purpose of its being invested in real estate, until the annuity shall amount to the full sum of $400,000, exclusive of the interest which may have accrued on it.

He gives and bequeathes the fourth eighth part of the net yearly revenue of the entire estate to the Mayor, Aldermen, and Inhabitants of the city of Baltimore, for the express and sole purpose of establishing a School Farm, on an extensive scale, for the destitute male children of Baltimore, of every town and village of Maryland, and of the great maritime cities of the United States, until the said eighth part shall amount to the sum of $3,000,000.

There now remains the revenue of one half or four eighths of the revenue of what the testator styles his general estate. The two cities of New Orleans and Baltimore being the principal legatees, it is obvious that they are entitled to the four eighths not bequeathed by a particular title; consequently, it is laid down that, until such time as these four annuities, bequeathed under a particular title, shall have been paid off and expire, the cities of New Orleans and Baltimore shall receive, for the establishment and support of said free schools, one half only of the net yearly revenue of rents of the general estate, and no more.

Moreover, the total amount to be received by each of the legatees of one eighth of the revenue, until the respective sums of $25,000, $600,000, $400,000, or $3,000,000 are realized, shows that one of the annuities is to determine before the others are paid off. The testator, therefore, orders that, as soon as any one of the annuities shall be filled and paid off, the proportions of the net yearly revenue of rents of the general estate, which were payable under the extinct annuity, shall go and be payable to the annuity, bequeathed to the city of Baltimore, for

the establishment of a School Farm; so that the $3,000,000 may be made up in as short a space of time as possible. It will not be till the full and entire discharge of the annuities, that the two cities will divide between them the net yearly revenue of rents of the general estate.

We will now turn our attention to the means and devices adopted by the testator to improve the condition of his particular legatees.

He forbids the alienation of the real estate which he leaves at his death to the two cities; and points out how the houses shall be let for short terms, the unimproved lots let for twenty-five years, at most, so as to be revertible, together with all improvements, to the mass of his estate; and the lands leased out, so as to bring in returns more and more ample.

He also orders his testamentary executors to invest his personalty in houses and building lots in New Orleans and its suburbs.

He has not ordered any thing of the kind for the $25,000 of the Colonization Society (first eighth.) The sum is a small one, and can be paid off in a short time.

But as respects the Society for the Relief of Destitute Orphans, (third eighth,) he gives this third eighth part of the revenues to be first deposited in one or more of the banks in New Orleans, which allow interest on deposits; and then, always with the approbation of the Mayor, Aldermen, and Inhabitants of New Orleans, who shall become parties to the deeds, the said society shall invest the money, as good purchases offer, in houses and lots lying in New Orleans and its suburbs, so that such real estate, once acquired, shall be inalienable, and shall for ever be retained and held by it, and remain its property, in order that the revenue of the said real estate may be sufficient for the support of the institution.

With respect to the particular legacy bequeathed to the city of New Orleans, for the purpose of establishing an Asylum for the Poor, (second eighth,) he orders that, annually or semi-annually, the amount of the fractions of eighths be invested, as the commissioners receive it, in bank stocks, or other good securities on landed estate, on interest, so that the capital of $3,000,000, may be thereby augmented up to the time when the last of the annuity shall be received from the general estate; that, after this period, (or even earlier, if a favorable opportunity occur,) one third of the whole (not more) be invested in the purchase of landed estate, in the erection of buildings, and the furnishing of necessary articles; and the remainder, or two thirds at least, invested in the purchase of such houses and building lots, in New Orleans and its suburbs, as will probably

greatly augment in value; which real estate, when purchased, shall never be alienated, but a permanent revenue derived therefrom for the support of the institution.

Again, as regards the particular legacy bequeathed to the city of Baltimore for a School Farm, (fourth eighth,) which legacy is to reach the amount of $3,000,000, to be taken out of the eighth charged therewith, and out of the other three eighths as soon as the other three legacies are finally paid off, the fund must be increased as it is received, by investing the moneys in bank stocks, or other good securities on landed estate, on interest; and this capital, with its increase, shall be invested, for one sixth part at the utmost, in the purchase of such land, animals, and agricultural implements as the institution shall need; and the other five sixths invested in the purchase of houses and building lots situated in the city, suburbs, and vicinage of Baltimore, or of tracts of land in its immediate neighborhood, viz., such lots or lands (to be all purchased under fee-simple titles) as will probably greatly augment in value. 'And, in this instance too, the real estate, when purchased, is never to be sold or alienated, but is to remain forever the property of the institution, to the end that a permanent revenue may be derived therefrom.

We will now examine the measures taken by the testator to prevent the cities from giving the moneys a different destination from that prescribed by the testator.

Not content with appointing testamentary executors, McDonogh, wishing to debar the city corporations from the handling of moneys, has ordered that there be commissioners of his estate, having a principal and central office in the city of New Orleans, where all the muniments and papers relating to his affairs may be kept, as well for the Asylum for the Poor, for the investment of the moneys due to the Orphan Relief Society, for the School Farm of Baltimore, as for the management of the general estate, or fund for the education of the poor. These commissioners are to have the sole management of the general estate, the leasing and renting of its lands and houses, the cultivating of its estates, the collecting of its rents, the paying of the annuities bequeathed as above, and are to do all acts necessary to its full and perfect management.

These commissioners cannot be members of the City Councils; but they shall be appointed by the City Councils of New Orleans, as regards the Asylum for the Poor; by the Mayor and City Councils, as respects the School Farm at Baltimore, with the style of Directors; by the respective City Councils of New Orleans and Baltimore, as to the management of the fund for the education of the poor.

New appointments shall be made annually, on a day fixed by the will.

The city councils shall have a supervision over their operations; and to them the commissioners are liable for the performance of all their duties, and must annually render an account of their administration.

Besides these commissioners, each city shall have agents on the spot to represent its commissioners; and these agents shall also be appointed by the mayors and city councils.

And, after the payment of the annuities, the respective commissioners, or the agents representing them, shall receive one moiety of the net revenue of the year, to be disposed of conformably to the will.

As for the purchases to be made, before the full payment of the annuities by the Commissioners of the Asylum for the Poor, they must be approved by the Mayor and City Councils of New Orleans. The same rule is laid down for the purchases to be made by the Directors of the School Farm. They must be approved by the Mayor and City Council of Baltimore.

The testator recommends to the Commissioners of the Asylum for the Poor to apply to the legislature of the State of Louisiana for an act of incorporation, subject always, however, to the conditions provided for in the will. He has also recommended, in the same language and under the same conditions, to the Directors of the Farm School, to apply, for the same purpose, to the legislature of the State of Maryland. He recurs to the same idea, using the same phraseology; and with the intent, no doubt, that his general estate should become a juridical person, he also recommends to the commissioners to sue out an act of incorporation for said general estate, always subject to the conditions laid down in the will.

We omit a variety of minute regulations concerning the publication of the annual accounts, the building and locality of school-houses and residences for teachers, the school organization, the immense lands for the Poor Asylum, together with the high-flown disquisitions in which the testator indulges. All this matter appears to be foreign to the controversy. The whole may be reduced to these few words : " The cities are the devisees; but the administration of the property devised shall be carried on forever by commissioners appointed by the cities, and accountable to them; and it shall be the duty of said commissioners to hand over the moneys to the new public institutions which the testator orders to be created."

The testator goes on to say : " No compromise shall ever take place between the Mayor, Aldermen, and Inhabitants of

Baltimore, and those of New Orleans, or their successors, in relation to their respective rights to my general estate.".

" Neither party shall receive from the other, by agreement, a certain sum of money annually, or otherwise; for its respective proportions. Neither party shall sell its respective rights under this will, to the general estate, to the other or to others; but said general estate shall forever remain, and be managed, as I have pointed out, ordered, and directed.

" And should the Mayor and Aldermen of New Orleans, and the Mayor and Aldermen of Baltimore, combine together, and knowingly and wilfully violate any of the conditions hereinbefore and hereinafter directed, for the management of the general estate, and the application of the revenue arising therefrom, then I give and bequeathe the rest, residue, remainder, and accumulations of my said general estate, (subject always, however, to the payment of the aforementioned annuities,) to the States of Louisiana and Maryland, in equal proportions, to each of said States, of half and half, for the purpose of educating the poor of said States, under such a general system of education as their respective legislatures shall establish by law, (always understood and provided, however, that the real estate thus destined by me for said purpose of education, shall never be sold, or alienated, but shall be kept, and managed as they, the said legislatures of said States, shall establish by law, as a fund yielding rents forever; the rents only of which general estate shall be taken and expended for said purpose of educating the poor of said respective States, and for no other.) And it is furthermore my wish and desire, and I hereby will, that in case there should be a lapse of both the legacies to the cities of New Orleans and Baltimore, or either of them, wholly or in part, by refusal to accept, or any other cause or means whatsoever, then, both or either of said legacies, wholly or partially lapsed, shall inure, as far as it relates to New Orleans, to the State of Louisiana, and, as far as it relates to Baltimore, to the State of Maryland, that the legislatures of those States, respectively, may carry out my intentions, as set forth in this my will, as far and in the manner which will appear to them most proper."

In October, 1852, the Judge of the District Court, sitting as a Circuit Judge, passed the following decree, viz.

That all that part of the olographic will of John McDonogh, beginning at the second paragraph with the words " It is my will and I direct my executors, (hereinafter named,) immediately after my death, to correspond," &c., on the second page, numbered as the sixth page of the printed copy of the will on file, and ending with the words " or otherways, and held and owned by said corporations," on the 33d page of the said printed copy

of said will, being all and every portion of said will relative to the city of New Orleans, the city of Baltimore, the State of Louisiana, and the State of Maryland, the "general estate," the Colonization Society, a projected asylum in New Orleans, the Society for the relief of Destitute Orphan Boys, a projected school farm in Maryland, free public schools in New Orleans and Baltimore, and the appointment of various boards of commissioners, agents, directors, &c., and for the investment and accumulation of the estate, be, and all said provisions are, declared illegal, null, and of no force and effect whatever; and that as to all the estate of said deceased, except such as is disposed of in the first paragraph of said will, the deceased died intestate, and his estate fell, by his death, to his heirs at law. That complainants are heirs at law of the deceased John McDonogh, in the following proportions, to wit: Maria Louisa Ord, wife of Pacificus Ord, Laura J. Welsh, Thomas Welsh, Frank E. Welsh, and William P. Welsh, minors, represented by their guardian, William F. Murdoch, are heirs of twelve seventieths, ($\frac{12}{70}$ths); one half of said portion being for the said Maria Louisa, and the other half being equally divided between said minors. Anne Cole, Mary Murdoch, wife of William F. Murdoch, Eliza Hayne, wife of George Hayne, George F. Cole, Louisa Sheffey, wife of Hugh W. Sheffey, and the children of Margaret Cole, the deceased wife of George P. Jenkins, namely, George Jenkins, Mary McDonogh Jenkins, and Conway M. Jenkins, minors, represented by their father George T. Jenkins, are heirs of twelve seventieths of the estate. The said Anna, Mary, Eliza, George F., and Louisa, each to take one sixth part of said portion, and the remaining one sixth part thereof to be equally divided between said minors. Sarah Day, wife of Nicholas Day, is heir of twelve seventieths of the estate. Jane Beaver, wife of William Beaver, Sarah Beaver, wife of Jacob Beaver, Robert H. Hammett, Jesse Hammett, Anne Maria Snook, wife of Peter Snook, Eliza Anderson, wife of Joseph C. Anderson, and the children of Margaret Hammett, deceased, (said children not being parties,) are heirs of twelve seventieths of the estate; the said Jane, Sarah, Robert, Jesse, Ann, and Eliza, to take each a seventh part of said portion, and the remaining seventh to be reserved for the children of said Margaret, when they shall make themselves parties, and on due proof. Rosalba P. Lynch, wife of Andrew H. Lynch, is heir of twelve seventieths of the estate; the remaining ten seventieths to be reserved for the heirs of the half-blood, when they shall make themselves parties, and on due proof. That the said complainants recover of the defendants' executors of the will of the deceased all and singular the property, real and per-

sonal, corporeal and incorporeal, composing the estate of the deceased, and especially all and singular the property of the deceased, in the several parishes of the State of Louisiana, mentioned or comprised in the inventory of the succession, prepared by Thomas Layton and Adolph Mazureau, notaries public, a copy of which is in evidence; and that said complainants have execution, and be put in possession of the same, in conformity with law and the rules of court. That reference be made to the master in chancery for an account of the administration of the said executors, from the death of the deceased to the execution of this decree; and that said executors account to the said master in the premises, and that said master report to the court; and so much of the said bill as demands said account and the recovery of any moneys in the hands of said executors, is retained for further decree. That any other person or persons, not now parties to the proceedings, claiming title to the estate of the deceased, or any part thereof, be allowed to present their claims respectively before this court, to make due proofs thereof, and to become parties to the proceedings for the due establishment and adjudication thereof. That the costs of the complainants and of the executors, be paid out of the succession of said deceased, and the costs of the other parties defendant by themselves respectively.

Decree rendered 7th October, 1852.

Signed 26th October, 1852.

[SEAL.]    THEO. H. McCALEB, *United States Judge.*

From this decree, the executors appealed to this court.

It was argued by *Mr. Brent, Mr. May,* and *Mr. Hunt,* for the appellants, and by *Mr. Benjamin* and *Mr. Johnson* for the appellees. There were also briefs filed, being adopted by the counsel in this cause, prepared by the French jurists above spoken of, by Mr. Pierce and Mr. Grailhe which were used before the Supreme Court of Louisiana, in a case wherein that State contended that the legacies had become lapsed, and consequently inured, in part, to the benefit of that State.

From all this mass of materials, the reporter can only extract notices of some of the most important points which were discussed.

The counsel for the appellants arranged their arguments under the following heads:

First. That the validity of these legacies and annuities depends exclusively on the local laws of Louisiana.

Secondly. That the exposition of those laws, written or unwritten, by the courts of Louisiana, form part of the local

32 *

SUPREME COURT.

law, and as such will be followed and respected by the Federal courts, and this, whether expressed by a series of decisions or a single one, pronounced, by the State court "*post litem motam,*" or even after the decision of this cause in the United States Circuit Court.

Thirdly. That by the laws of Louisiana, legacies for the benefit of the poor, or for education, or establishments of public utility, are legacies to pious uses, and, as such are preëminently favored and protected by law, so much so, that they shall not be suffered, in any event, to fail, unless found liable to be annulled, as "substitutions or *fidei commissa.*"

Fourthly. That the universal legatees (the cities) have legal capacity to take the legacies bequeathed to them.

Fifthly. That legacies like these are, in no respect, subject to the prohibitions against substitutions and *fidei commissum.*

Sixthly. That whatever conditions are found in the annuities or legacies, of an illegal or impossible character, are to be considered as erased from the will, by operation and judgment of law, and no illegal or impossible clause, which is not a condition to the legacies, can prove prejudicial.

Seventhly. That even the lapse or annulment of the annuities, from any cause, they being distinct from the universal legacies, so far from affecting their validity, would benefit them, by inuring, entirely and exclusively, to their increase and benefit.

Eighthly. That the two cities are invested with a sufficient legal title as universal legatees, which is not impeached, either by any subsequent provisions, repugnant to the nature of the ownership instituted in them, or by any illegal or impossible conditions annexed by the testator to his legacies, because the title bequeathed, can well stand without, and discharged from the conditions thus imposed, wherever they may be illegal or impossible.

Ninthly. That this very will of McDonogh has been finally and authoritatively adjudicated by the Supreme Court of Louisiana, to be valid under the laws of that State; and such being the judgment of the highest State tribunal, it is conclusive upon this court, upon all questions involving the laws of Louisiana, and can only be revised, or its authority denied, on the ground that it is, in some respect, in conflict with the Constitution or laws of the United States.

Fifth point. Legacies like these are, in no respect, subject to the prohibitions against substitutions and *fidei commissa.*

Both substitutions and *fidei commissa* are prohibited by the Civil Code, Art. 1507.

The legacies to the cities cannot be brought within the category of either of the four classes of substitutions, known to the civil or Spanish Law. Johnson's Civil Law of Spain, 132.

The vulgar substitution would apply to the substituted legacies over to the States. Johnson's Civil Law, 132.

And the States, therefore, could not take, in the face of the prohibition of Art. 1507, but for the express saving contained in Art. 1508, which declares, that "the disposition by which a third person is called to take the gift, the inheritance, or the legacy, in case the donee, the heir, or the legatee, does not take it, shall not be considered a substitution, and shall be valid."

Nor is there any thing of the "substitution, *fidei commissaria*," which is made by giving it in trust to some one appointed heir, to hold the inheritance for a given time, that he may deliver it afterwards to another." Johnson's Civil Law, 126; Beaulieu v. Ternoir, 5 Annual, p. 480. See also the case decided by the Court of Cassation in France, cited in the appendix to this brief.

There is, therefore, nothing of a prohibited substitution in this will, and especially none in respect to the title of the cities.

*Fidei commissa* are equally prohibited by Art. 1507, but there is this difference, that a prohibited substitution annuls the first legacy, in respect to which there is a substituted legatee, while in the case of a *fidei commissum*, the first legacy is not avoided if the trust, or *fidei commissum*, be to a third party for the benefit of the second, or substituted legatee, and distinct from the first legacy. 5 Annual, 480 – 1; DuP'essis v. Kennedy, 6 L. R. 247.

Therefore, to avoid the title of the cities on this ground, there must be either a bequest, in trust for them, or to them in trust for a third party.

Let us examine the decisions on this question.

In the case of Franklin's will, Chief Justice Eustis declared, that "the prohibition certainly embraced the substitutions, and the *fidei commissum* of the Roman, the French, and the Spanish laws." See page 21 of his opinion.

And, in the same case, he considers *fidei commissum* synonymous with trust, under the English law. And this court has decided the prohibition to extend only to express trusts. Gaines v. Chew, 2 Howard, 650.

Now, to constitute a case of strict trust, under the English law, or of *fidei commissum*, under the civil law, the trust must not be for the benefit or use of the trustee.

If a legacy is to A, in trust for his own use, it would not be a trust, either under the English or civil law.

Legacies to corporations, or funds in their possession for public purposes, will be enforced in equity as charitable funds. 2 Spence's Eq. 34; see Attorney-General v. Heelis, 2 Sim. & St. 76; Attorney-General v. Carlisle, 2 Sim. 427; Attorney-General v. Brown, 1 Swanst. 297.

It is true that, in the parlance of English chancellors, a de-
vise to a corporation for the benefit of its poor, or for any cha-
ritable purpose connected with the purposes of the corporation,
is loosely termed a trust, which chancery will enforce; but
though such a dedication to charitable uses be fiduciary in its
nature, yet we confidently submit, that a legacy to a corporation
for the benefit of its poor, or any establishment of public utility,
is not that sort of express trust to which the prohibition in the
Code of Louisiana has reference. If an individual is the trustee
for a third person, or for the poor, it might be safely admitted,
that in both cases it was a *fidei commissum*, because he was a
stranger to the beneficiaries, but not so when corporations are
the legatees, and the legacies, in the words of this court in Vidal
*v.* Girard, 2 Howard, 189, are for purposes " germane to the
objects of the incorporation," and " relate to matters which will
promote and aid and perfect those objects."

One of the illustrations is furnished in the same opinion of
this court, in 2 Howard, 189, where it supposes the case of a
devise to Philadelphia " to supply its inhabitants with good and
wholesome water."

That might, in some sense, be called a trust, but, " relating to
matters which promote, aid, and perfect the objects of incorpo-
ration," it could not be considered that sort of trust in which the
beneficiary is foreign to the trustee, and therefore prohibited.

But it seems to us that this very question has been conclu-
sively settled by the Supreme Court of Louisiana, in the case
of DePontalba *v.* New Orleans, 3 Annual Reports, 662, decided
in 1848.    See D. R. Richard *v.* Milne, 17 La. Rep. 320.

In that case the testator bequeathed a hospital to the city for
the use of lepers, and the city having afterwards, when there
were no lepers, converted it into a cemetery, the court held
" that the city had a legal title to the property as against the
heir at law, though the purpose of the legacy had failed." Now
that was undoubtedly a legacy in trust for the benefit of a par-
ticular class of the community of New Orleans, and would
have been termed by English chancellors a trust, still it was
held by the Supreme Court of Louisiana, to be a valid title in
the city, notwithstanding the prohibition against " *fidei com-
missa*," which is not even noticed.

This decision, made under Spanish laws reënacted, is the very
civil code which is now relied on to destroy legacies to the same
city for the support and education of its poor, has, therefore, in
our humble judgment conclusively and clearly exempted from the
prohibition of article 1507 all legacies to a city for the benefit
of its poor, or any work of public utility, or any purpose " ger-
mane to the objects of incorporation."

If these legacies for the "establishment of free schools in Baltimore and New Orleans" be stamped with the character of the prohibited "*fidei commissa,*" then you must, under the same article of the code, annul every legacy in trust for any legitimate purpose of the corporation, or for establishments of utility and benefit, and to accomplish that end you must not only declare that legacies to corporations for their own benefit are trusts in the meaning of the law, and as such within the prohibition, but you must reserve and strike down the well-settled construction by her courts of the Civil Code of Louisiana. A doubt would escape the prohibition. Cole *v.* Cole; 7 Martin, (N. S.) 418.

We will here beg leave to incorporate into this argument so much of the opinion of Chief Justice Eustis, pronounced on this will of McDonogh, as relates to this question, and which seems to us unanswerable:

" That, without a positive prohibition, municipal corporations in Louisiana should be incapacitated from receiving legacies for the public purposes of health, education, and charity, seems to me repugnant to all sound ideas of policy and to the reason of the law.

" What legacies could they be expected to receive except for some public or humane object? Who would give a city a legacy, to be absorbed by its debts or appropriated to common expenses? Certainly, so far as the conscience of the public is concerned, a legacy of money to a city without any designation would be held to have been given for some object of charity or beneficence.

" I think there are articles in the code which exclude the conclusion as to the incapacity of the city of New Orleans to take legacies of this kind.

" The article 1536 provides that donations for the benefit of a hospital of the poor of a community, or of establishments of public utility, shall be accepted by the administrators of such communities or establishments.

" Provision is made by this article to give effect to donations for the poor made by living persons, *inter vivos,* because in donations of this kind the donor is not bound, and the donation is without effect until the act of donation is signed and accepted by a party competent to receive the donation. The article relates to the form of the act and provides for its acceptance and the completion of the donation, and is not its legality presupposed? Is it not predicated upon the legality of this mode of property for pious uses? Such appears to me to be the obvious intendment of the article.

" There is not the slightest ground for any distinction as to the legality of the holding or ownership by d nation *inter vivos*

and *mortis causa*—that is, that the property could be acquired by one donation and not by the other.

" Nor does the law make any distinction between a legacy to the poor of a city, and a legacy to a city for the poor.   For in both cases it is a legacy to pious uses, and the city is the recipient.   Domat, lib. 4, tit. 2; Sect. 2, § 13; Id. Sect. 6, § 1 et seq.

" The article 1543 provides that when the donation is made to minors, to persons under interdiction, or to public establishments, the registry shall be made at the instance of curators, tutors, or administrators.

" The article 607 provides that the usufruct granted to corporations, congregations, and other companies which are deemed perpetual, lasts only thirty years.   If these corporations, congregations, and companies are suppressed, abolished, or terminate in any other manner, the usufruct ceases and becomes united with the ownership.

" The legislation concerning the powers of the city of New Orleans, I think, is in the same sense.

" Doubts having existed as to the power of the city to hold property out of its limits, the corporation was declared ' capable of holding or possessing real estate without its limits, and of acquiring, retaining, and possessing, by donation or legacy, any property, real or personal, whether situate within or without the limits of the city.'   Act of 1830, p. 50.   Digest of Stat. 144, § 150.

" I have no doubt of the legality of the testamentary disposition under consideration.

" I think it would follow, as a necessary consequence from the definition, origin, and nature of legacies to pious uses, that if those in favor of the cities are of that sort, those in favor of the States, in the contingency provided, are of the same character. The difference is, that in the former the mode of administration is regulated by the will, in the latter it is left to the wisdom and discretion of the legislative power.

" The administration of property devoted to pious uses by a legacy, through the instrumentality of overseers, commissioners, or a *quasi* corporation, makes no difference as to the title; both in fact are legacies to pious uses, and not unlike the Girard legacy maintained by this court in 2d Annual Reports, 898. Girard Heirs *v.* New Orleans."

This opinion was concurred in by Mr. Justice Dunbar.

*Ninth Point.*— *The conclusiveness and binding effect of the judicial decisions of the State Courts of Louisiana upon the construction and exposition of the Civil Code and the Unwritten Laws of that State.*

In elucidating the above proposition, our remarks will neces-

sarily be confined exclusively almost to a consideration of the decisions of the Supreme Court of the United States.

This case depends on the construction to be given to the laws of Louisiana, composed of a written code, and of so much of the Roman, Spanish, and French laws, as are judicially recog-nized as of authority in that State.

The Supreme Court of Louisiana, in the case of the State of Louisiana against the executors of McDonogh, has given a construction to this very will, founded on the local law, which, in effect, defeats the claim of the heirs at law.

But before that judgment was pronounced, the Circuit Court of the United States for the District of Louisiana, in a cause instituted in that court by the heirs at law against the execu-tors, decreed in favor of the heirs.

That decree is now before the Supreme Court of the United States on appeal, and the important inquiry is, whether the decision of the Supreme Court of Louisiana is not conclusive upon all the questions in the case, depending on the construc-tion of either the written, or unwritten law of that State.

In cases depending on the laws of a particular State, the Supreme Court of the United States has uniformly adopted the construction which the supreme judicial tribunal of the State has given to those laws. And the reason on which this rule is founded, is stated by Chief Justice Marshall to be, that "the judicial department of every government, is the appropriate organ for construing the legislative acts of that government." 10 Wheaton, 159.

The cases in which the Supreme Court has conformed to the decisions of State courts, are very numerous. The following list of references may save the trouble of search, though it does not comprise the whole : 5 Cranch, 22; Id. 221; Id. 255; 6 Id. 165; 9 Id. 87; 2 Wheaton, 316; 5 Id. 270; 6 Id. 119; 7 Id. 361; 10 Id. 152; 11 Id. 361; 12 Id. 153; 2 Peters, 492; Id. 89; 4 Id. 124; 6 Id. 291; 15 Id. 449; 5 Howard, 134; 6 Id. 1; 7 Id. 198, 219; Id. 812, 818; 10 Id. 401; 13 Id. 271; 14 Id. 485, 504.

In St. John v. Chew, 12 Wheaton, 153, it is said: " This court adopts the local law of real property, as ascertained by the decisions of the State courts, whether those decisions are grounded on the construction of the statutes, or form a part of the unwritten law of the State."

In Elmendorf v. Taylor, 10 Wheaton, 165, the court say : " We must consider the construction as settled finally by the courts of the State; and this court ought to adopt the same rule, should we even doubt its correctness."

Neves v. Scott, 13 How. 271, decided that this court, on

appeal from the Circuit Court, would not be governed by the decision of the Supreme Court of the State, upon any question dependent upon general chancery principles; but the court clearly intimate that it would be otherwise if the case had depended upon "the legislation of Georgia, or the local laws or customs of that State."

In Nesmith v. Sheldon, 7 Howard, 812, in which the court, in an equity cause, held a single decision of the Supreme Court of Michigan on the same question to be conclusive, that question depending on the construction of the constitution and local laws of the State.

The court will not demand a series of State decisions, but will hold itself bound by a single decision of the highest State tribunal.

In the Bank of Hamilton v. Dudley, 2 Peters, 492, there was but a single decision, and that by a divided court, and yet it was regarded as conclusive.

In Gardner v. Collins, 2 Peters, 89, the court say : " If this question had been settled by any judicial decision in the State where the land lies, we should, upon the uniform principles adopted by this court, recognize that decision as part of the local law."

In the United States v. Morrison, 4 Peters, 124, and Green v. Neal, 6 Peters, 291, a single decision of the highest State court, was held sufficient.

Again: in the Bank of Hamilton v. Dudley, 2 Peters, 492, after the case had been argued in the Supreme Court, the court hearing that the same question was depending before the highest judicial tribunal of the State, (Ohio,) held the case under advisement till the next term, to receive the opinion, and after it had been given, conformed to it.   See also 7 Howard, 812, 818.

Again, the decision of a circuit judge, though made prior in time to the decision of a State court, upon the same question, does not affect the conclusiveness of the latter.   Thus, in the United States v. Morrison, 4 Peters, 124, the Circuit Court of the United States for Virginia (Chief Justice Marshall, presiding) made a decision upon the construction of a State statute, in regard to which different opinions had been entertained; subsequently to which, the same question was decided the other way by the court of appeals of Virginia.   And though this State decision had not been reported, but was quoted in manuscript, when the case came before the Supreme Court of the United States, Chief Justice Marshall, delivering the opinion, reversed his own judgment in the Circuit Court.

The rule was afterwards conformed to in a still stronger case. The Supreme Court had twice decided the same question, as to

the true construction of the statutes of limitations of Tennessee, upon the authority of two decided cases in the Supreme Court of that State, in 1815. But in 1832, in the case of Green *v.* Neal, 6 Peters, 291, it appearing that these decisions were made under such circumstances that they were never considered, in the State of Tennessee, as fully settling the construction of the statutes; and that in 1825 the Court of Appeals, by a single decision, had ruled the point differently, the Supreme Court overruled its two former decisions, and adopted that of the State court, as the last and authoritative.

In the case of Grove *v.* Slaughter, 15 Peters, 449, the court did not depart from this established rule. The State decision relied on, as settling the construction of a provision in the Constitution of Mississippi, was the decision of a divided court — was extrajudicial, and contrary to the legislative construction of the provision, and we will add especially, that it was made after the date of the contract in controversy in that case, and impaired the obligation of the contract. In Groves and Slaughter, the note in suit was dated December 20th, 1836, (15 Peters, 449,) and the State decision, relied on to invalidate the note, was that of Glidewell, &c. *v.* Hite and Fitzpatrick, not then reported; (see 15 Peters, 497,) but since reported in 5 Howard's Mississippi Reports, 110, by which report, it appears that the State decision was not made until December, 1840, four years after the date of the contract which it sought to impair. It was therefore considered by the Supreme Court as an open, unsettled question, and so decided.

The same question, on the same clause of the Constitution of Mississippi, afterwards, in 1847, came again before the Supreme Court, in Rowan *v.* Runnels, 5 Howard, 134. In the intermediate time, however, after the decision in Groves *v.* Slaughter, the question of construction had been decided by the highest tribunal of the State, differently from the decision of the Supreme Court. Both Groves *v.* Slaughter, and Rowan *v.* Runnels, were cases arising upon contracts, identical as to subject-matter; and the court felt an insurmountable difficulty in following a State decision, made subsequently to the date of the contract between citizens of different States, and annulling it retroactively; which contract, on full consideration, the Supreme Court of the United States had pronounced valid, and they, therefore, adhered to their first decision, Mr. Justice Daniel dissenting, however, even in the case of a contract.

See also to same effect, Sims *v.* Hundley, 6 Howard, 1.

The whole amount of these decisions is, that in cases arising upon contract, where the Supreme Court, in the absence of any State decision settling the construction of a provision in the

State constitution, in reference to the validity of the contract, had decided in favor of its validity, they would not reverse that decision, on the ground of an adjudication of the question contrariwise, by a State court, if that adjudication was made subsequently, not only to the first decision by the Federal court, but subsequently to the very contract in issue, between parties who were, by the Federal Constitution, entitled to an adjudication on that contract, by the Federal courts.

If it had been a case involving questions of title to real property, or the construction of local laws, irrespective of contract, the court would, no doubt, have been governed by Green v. Neal, 6 Peters, 291, and have overruled its former decision in Groves v. Slaughter. See Nesmith v. Sheldon, 7 How. 813.

To say nothing, however, of the distinction taken by the court in this case of Rowan v. Runnels, it is very clear that the decision is altogether inapplicable to the case of the heirs at law and the executors of McDonogh.

In this case, the question depends on a will of real and personal property, as to which there has been no decision of the Supreme Court; and in wills this court adopts the local law bearing on the case. 7 How. 813, 814, 504; Patterson v. Gaines, How.; Vidal v. Girard, 2 How. 128; Wheeler v. Alexandria, How.

The validity of the will is to be determined by a true construction of the written and unwritten law of Louisiana; and the tribunal of the last resort in that State has decided in favor of its validity. " Undoubtedly," said the Chief Justice, in Rowan v. Runnels, " this court will always feel itself bound to respect the decisions of the State courts; and from the time they are made, will regard them as conclusive, in all cases, upon the construction of their own constitution and laws. But we ought not to give them a retroactive effect, and allow them to render invalid contracts entered into with citizens of other States, which, in the judgment of this court, were wrongfully made.

These decisions, therefore, of the Supreme Court of the United States, denying the binding effect of subsequent State decisions, so as to retroact on antecedent contracts, are fully warranted by the spirit, if not the letter, of that clause in the Federal Constitution, which prohibits the States from passing " any law impairing the obligation of contracts."

For, if the sovereignty of the States is not competent to legislate away the obligation of contracts lawfully entered into at the time, it should equally follow that the State Courts cannot construe away the obligation of antecedent contracts, which the Constitution meant to protect from every department of the State governments, and to place under the protecting ægis of the federal judiciary.

But when we come to consider the effect of a decision by the State tribunals upon their local laws, involving any matter not impairing the obligation of a contract, the case is one of a very different character. It must, in that case, result from principle, and the authoritative decisions of this court, that if the validity of a Louisiana will is to be tested by the laws of that State, the exposition of those laws, by her highest judicial tribunal, must be equally regarded as part of the local law of the State, and, as such, binding on the federal courts, whether it be established by a single decision, or by a series of decisions, and whether it involve title to real estate or personalty.

Baltimore and Susquehanna Railroad Company v. Nesbit, 10 How. 401, recognizes the principle that this court can, in no case, revise or annul retrospective State legislation, unless it violates some clause of the federal Constitution, or is in conflict with the laws of the United States.

Has this court any greater jurisdiction over the State judiciary, in expounding their own laws, than it would have over the legislature which makes them?

But it may be objected that the true reason why this court did not regard as conclusive a subsequent State decision in the cases of Groves v. Slaughter and Rowan v. Runnels, and Sims v. Hurdley, is not that they were cases of contracts, but because such subsequent decisions would deprive citizens of other States of the practical enjoyment of the privilege of suing in the federal courts on titles already vested in them, and to sustain this position, a paragraph will be cited from the opinion of the Chief Justice in Rowan v. Runnels, 5 Howard, 139.

But we respectfully submit that the State courts cannot be deprived of their legitimate function, of expounding authoritatively and conclusively the meaning of their own State laws, merely because, at the time of such exposition, there were parties *in esse* who had a right to sue, or who had sued in the federal courts upon titles already vested in them by virtue of the State laws.

It would be monstrous if the federal courts, obtaining jurisdiction "*ratione personarum*" alone, were to exercise that jurisdiction for the single purpose of prostrating and annulling all expositions of the State laws by the State courts, which had been made after the right had attached to sue in the federal courts.

It is not to be presumed that the State tribunal has so decided from a motive to oppress or prejudice the plaintiffs in the federal courts; and, in the absence of such a presumption, the federal courts are as much bound in a case where their jurisdiction is acquired alone by the character of the parties, to re-

spect the local law, as expounded by local tribunals, "*pendente lite,*" or "*post litem motam,*" as if it had been declared before the right attached to sue in the federal courts.   We submit, with deference, that it is not a principle of "comity" only which gives force to the local decisions; but it is because State decisions, whenever made upon State laws, form part of those laws, and, as such, are the governing rule of the United States courts in every case dependent on State laws, except in the solitary instance of State decisions retroacting on antecedent contracts, and this principle appears to have been adopted by this court, on full and deliberate consideration, in the case of Green *v.* Neal, 6 Pet. 298.

The counsel for the appellees made the following points:

I.  The first point to be settled is the true meaning of the will. This depends altogether on the signification of the language used by the testator, and on no peculiarity of local law.   The rules of interpretation laid down by the civil code of Louisiana, (acts of 1705 *et seq.*) correspond with those which guide judges in the courts of common law.   All aim, alike, at discerning the intentions of the testator; and as McDonogh has used the English language in expressing those intentions, a reference to local jurisprudence is entirely useless, and this court has accordingly held, that it does not follow the construction of a State court on a will or deed, as it does on the construction of a statute. Lane *v.* Vick, 3 How. 464, 476; Russell *v.* Southard, 12 Id. 139.

We maintain the will of the testator to be a scheme devised by him for perpetuating his succession, under the name of his "general estate;" that the title to his property was intended by him to remain in his succession; that, under the cover of a bequest to the cities and States, he intended to shield his property from alienation; that the cities and States were not intended, under any circumstances, to be his beneficiaries; and that, if any title whatever, under the terms of the will, was bequeathed to the cities or States, it was a mere legal title as trustees, unaccompanied by any beneficial interest.

In support of this position, we rely on the plain language of the instrument itself.   It is true that the testator says that he "gives, wills, and bequeathes all the rest, residue, and remainder of his estate to the two cities;" but this clause begins by stating, that he makes the bequest "for the more general diffusion of knowledge," &c., and closes by stating that the bequest is "to and for the several interests and purposes hereinafter mentioned, declared, and set forth concerning the same," which purposes he immediately proceeds to specify.

By the analysis of the will, as already set forth, it will be seen that, after this introductory clause containing the devise, he provides,

1st. That his whole property, real and personal, "is to be converted into one mass, entitled his *general estate.*"

2d. That the seisin and possession of this "general estate" is to be vested in commissioners and agents, with perpetual succession, and the meaning of the word "seisin" is abundantly shown by the Civil Code, 934, 935, 936, 1600, 1602, 1609, 1617, 1652, 1653; 2 Black. Com. 311, marginal paging; Fowler et al. *v.* Boyd, 15 L. R. 562.

3d. That these commissioners are to obtain an act incorporating the "general estate."

4th. That they are to have the sole and exclusive management and control of the "general estate."

5. That "no part of said general estate, or revenues from rents arising from said general estate, shall go into the hands of the corporations of said cities, but that they, the said corporations, shall forever have a supervision over it."

6th. The testator further provides (p. 25) that "copies of the accounts of the general estate fund shall be delivered to the city councils of the city of New Orleans, who shall visit the books, examine and audit the accounts, and keep up and support a general supervision over the general estate, its accounts, funds, management, and real estate, as also over the free schools," &c.

7th. After providing for the establishment of free schools to educate the poor, the testator says, (p. 30,) " for this purpose, and this only, my desire being that one dollar shall never be expended to any other purpose, I destine the whole of my general estate."

In view of these provisions, so clearly and emphatically detailed, it is impossible to discover any of the elements which constitute title or ownership of property in the cities. The mind is at a loss to conceive what interest in an estate can appertain to parties who are never to have it in possession, never to receive one dollar of its revenues, never to alienate it, and never, even, to manage, administer, or control it. It is evident that all that is bequeathed to the cities is the power of appointing the officers of this imaginary entity, this corporation that the testator intended to create, under the name of his "general estate," coupled with functions which are precisely those attributed by law to the visitors of corporations (see 1 Blackstone, 401); and it is worthy of remark, that with this visitatorial agency Baltimore has nothing to do, beyond receiving annually certified

33 *

copies of the accounts of the general estate, and " publishing them in two of the newspapers of the city." Record, p. 25.

If there could be a doubt, under the terms of the will itself, that the testator's intention was to vest the title to his property, not in the cities, but in the general estate, that doubt would vanish on the simple perusal of his own commentary on his will, as contained in the memoranda before referred to. In them he styles the general estate " an institution of vast import-ance to the State and the world," p. 35. He speaks of the property as " belonging to the general estate," p. 36. He prays the city councils of New Orleans to exempt from taxation " the real estate belonging to said general estate," p. 36. He declares, at pp. 40 and 41, that he has selected land for investment, that " it may yield an annual revenue for the purposes to which it is destined forever;" and expresses the hope that "its rents will amount to some millions of dollars annually," and that it will become in time "a huge mountain of wealth." At p. 43, he speaks of two thousand lots " belonging to this estate, and which will be and remain the property of this estate at my death;" and finally, at p. 55, he concludes that "the great ob-ject I have in view, as may plainly be seen, is the gradual augmentation in value of the real estate which will belong to, and be owned by, the general estate for centuries to come."

II. If, however, it should be held that the words of devise to the cities vest a title in them, and that these words cannot be controlled nor explained away by the subsequent declarations of the testator, nor by the limitations which he himself has placed on their meaning, the appellees maintain that the title so vested is the legal estate alone, unconnected with the bene-ficial interest; that the cities are mere trustees; and that the beneficiaries of the trust are the asylums, societies, school farm, and free school provided for by the will.

The will contains, not what the civil law terms legacies to pious uses; not what the common law terms a legacy to a devisee, subject to a purpose; but it contains dispositions termed in the civil law, *fidei commissa*, and in the common law, a devise for a purpose to a devisee, or a trust; and wills, pre-cisely such in character as that before the court, have been the subject of interpretation under both systems of jurisprudence. 1 Jarman on Wills, (Perkins,) 457, top 2d ed., 503 of 1st ed., and authorities in notes; Lewin on Trusts, 24 Law Library, 87, top paging; Vidal and others *v.* Girard's executors, 2 How-ard, 127; Briggs *v.* Penny, 8 Eng. Law & Eq. Rep. 234–5; Heirs of Henderson *v.* Rost, 5 Annual Rep. 458; Succession Isaac Franklin, decided in Louisiana, June 22, 1852, printed in pamphlet; De Pontalba *v.* City of New Orleans, 3 Annual Rep.

660; Corporation of Gloucester *v.* Osborn, 1 H. of Lords, 285; 3 Hare, 136.

It is true that the will, in no part of it, uses the word "trust;" but it is too familiar a principle to need authority, that the use of this word is not essential to the constitution of a trust. Girard uses this word; and his devise to the city of Philadelphia was admitted by all to be a trust, nor would the fact have been controverted even if no such word had been found in the will. The civil law is identical with the common law on this point. Adams's Eq. 189 to 192, Am. ed. and cases cited in the note; Briggs *v.* Penny, 8 English Law & Eq. 231–5; 2 Story's Eq. Juris. § 964–5, 1068, 1074; 1 Jarman on Wills, 334.

But, independently of these considerations, the whole of the ancient civil law doctrine of destination to pious uses has been repealed by an act of the legislature of Louisiana, of March 25, 1828, and the Civil Code contains the rules governing the case. See Acts Assembly of Louisiana, 1828; Civil Code, art. 3521; Handy *v.* Parkinson, 10 L. R. 92; Reynolds *v.* Swain, 13 L. R. 198.

III. The will of John McDonogh is null, because it violates the prohibition of the law of Louisiana against substitutions and *fidei commissa.* Civil Code, art. 15, arts. 1507 *et seq.*

The devise of property, with the prohibition against its alienation, when made with a view to a purpose, has been held to be a *fidei commissum* by all authors who have written on the civil law. A direction not to alienate, where the motive is the benefit of the legatee himself, is a mere *nudum præceptum;* as where a legacy is left of an estate to Titus, who is prohibited from disposing of it, in order that his improvidence may never deprive him of the means of subsistence. But a prohibition against alienating, in order that, in ten years, or at the death of Titus, the estate may become the property of Caius, or may be devoted to any purpose not personal to Titus, contains the very essence of the technical *fidei commissum* and substitution. C. C. 1507; Ricard. Traite des Substitutions, vol. 2, p. 323; Merlin, vol. 32, Verbo. Bis. p. 152; Pothier, Substitutions, No. 584, vol. 6, p. 517, ed. of 1777, in Cong. Library; Toullier, vol. 6, No. 488: 2 Strahan's Domat, 3861; Hermosilla, Gloss. 5, Part 5, Tit. 5, Law 44; 2 Gregorio Lopez, 781.

The *fidei commissum* of the civil law is not, as we concede, identical with the trust of the common law. The former, under the simple jurisprudence of the Romans, was a direction to the legatee to convey the property itself, or a part of it, in full ownership to the intended beneficiary; whereas the latter is a refinement, by which the perfect ownership is decomposed into

its constituent elements of legal title and beneficial interest, which are vested in different persons. But the term "*fidei commissum*" is constantly translated into the word "trust" by writers of authority under both systems, and it has been held in Louisiana, in a series of adjudicated cases, that the trust of the English law is embraced in the prohibition of the *fidei commissum* under the 1507th article of the code. For definition of the *fidei commissum*, see 2 Strahan's Domat, 3823; 3 Marcade, 375; 8 Duranton, 56; 32 Merlin Rep. Verbo Substitution; 5 Toullier, 18; 5 Zachariæ, 240; 14 Pothier's Pand. 186; Dig. Lib. 36, Tit. 1; Partidas VI. tit. 5, l. 1, 14; Antonio Gomez, Variæ Resolutiones, vol. 1, cap. 5; 2 Burge, Conflict of Laws, 100; Gaines *v.* Chew, 2 Howard, 650; Clague *v.* Clague, 13 L. R. 1; Tournoir *v.* Tournoir, 12 L. R. 19. And the proposition that wills containing the technical *fidei commissum* of the Roman law, or the trust of the English law, are utterly null and void in Louisiana; and that the latter estate is one unknown to its law, and abhorrent to its people and their institutions, is abundantly established by the following decisions: Tournoir *v.* Tournoir, 12 L. R. 19; Clague *v.* Clague, 13 L. R. 1; Liautaud *v.* Baptiste, 3 Rob. Rep. 453; Harper *v.* Stanbrough, 2 Annual, 381; Tirrell et al. *v.* Allen, 7 Annual; Ducloslange *v.* Ross, 3 Annual, 432; Beaulieu *v.* Ternoir, 5 Annual, 480; Heirs of Henderson *v.* Rost, 5 Annual, 458; Macarty *v.* Tio, 6 Annual; Franklin case above cited; C. C. 487, *et seq.*

The principle that parties are not at liberty to invest new tenures of property and to impress such tenures on their lands, is one not peculiar to Louisiana, but is a part of the public policy of every country. Kipper *v.* Bailey, 8 Eng. Ch. Rep. 120.

And the decisions of the French courts, as well as the opinions of French jurists on the subject of *fidei commissa* and substitutions, are of no weight or value in Louisiana, by reason of the difference of the legislation of the two countries on the subject. Rowlett *v.* Shepherd, 4 La. Rep. 86; Ducloslange *v.* Ross, 3 Annual Rep. 432.

IV. There is nothing in the law of Louisiana making any exception to this general rule. The article 1536 of the Civil Code, cannot, without violent misconstruction, be applied in any manner to this subject-matter. The Code contains a title called Title 2 of Donations *inter vivos* and *mortis causa*. It is divided into seven chapters, of which the first four are applicable to both classes of donations, and the prohibition in article 1507 against *fidei commissa* is in the chapter 4 entitled "Of dispositions reprobated by law in donations *inter vivos* and *mortis causa*." After exhausting, in these four chapters, such provisions as are applicable to both classes of donations, the Code

proceeds, in chapter 5, to treat separately of donations *inter vivos*, and in chapter 6 of donations *mortis causa*, placing in each of these chapters the special rules appropriated to its particular subject-matter.

Now chapter five embraces articles 1510 to 1562, and consequently includes the article 1536. Chapter five is divided into three sections, of which the second treats of the form of donations *inter vivos*. In prescribing this form the Code requires an authentic act to be passed before a notary, a delivery by the donor, and (in article 1527) an acceptance in precise terms by the donee. It then proceeds to provide for this acceptance by incapable parties. Article 1532 provides for a married woman; her acceptance must be with consent of her husband. Article 1533 provides that the acceptance for a minor may be by his tutor; 1534, that of an insane person by his curator; 1535, that of a deaf and dumb person by himself or attorney, or curator; 1536, "donations made for the benefit of an hospital, of the poor of a community, or of establishments of public utility shall be accepted by the administrators of such communities or establishments."

It is too plain for argument, on examination of the context of the Code, that this article 1536 has not the remotest bearing on the article 1507, and has not any reference whatever to the same subject-matter. So far from there being any exception in the Code authorizing corporations to become trustees, there is a positive prohibition pointed directly at corporations. See La. Code, article 432.

But there is another conclusive reason why the law can contain no exception in favor of the cities. The prohibition of trust estates in Louisiana is not alone a legal, it is also a constitutional, prohibition. Constitution of 1812, article 4, sec. 11; Constitution of 1845, article 120; Opinion of Chief Justice Eustis, in the Franklin case.

To construe article 1536 as conferring a power on cities to take estates in trust, is to violate the principle that when a capacity is granted by law to a corporation, the clause conferring it is to be construed subordinately to the general law, and not as giving powers beyond those conferred on individuals. McCartee v. Orphan Asylum, 9 Cowen, 437, 507. Jackson v. Hartwell, 8 Johns. 425.

This clause, if it confers the power supposed, must be subjected to the most rigid construction, and can never be made to comprehend such a trust as McDonogh has devised. In New York, from motives of public policy similar to those prevailing in Louisiana, the creation of trusts has been greatly restricted by statute. 2 Revised Statutes, p. 136.

The strictness with which this policy is enforced by her courts, and the rigor with which trusts contravening its spirit are annulled, may be seen in the cases of Jarvis *v.* Babcock, 5 Barb. 139; McSorley *v.* Wilson, 4 Sandf. Ch. Rep. 523.

V. The will of John McDonogh violates the law of Louisiana in separating the usufruct from the naked property of his estate forever. The nature of these two titles is explained in articles 479, 486, and 525 *et seq.* The law authorizes the separation of the usufruct from the ownership for one life only. Civil Code, 601, 1509.

But where the usufructuary is a corporation which is deemed perpetual, the right is expressly limited to thirty years. C. C. 607.

It is true that where a gift of perpetual usufruct is made, it is frequently construed into a gift of the property itself, on the ground that giving to a person the perpetual enjoyment of property is only a mode of expressing the gift of the title or ownership. See Arnauld *v.* Delachaise, 4 Annual Rep. 119; 2 Prudhon, 6–9.

But this is a mere rule of construction, subject to be controlled by the testator's expression of a contrary intention. The language of the will, as already set forth, expresses so clearly the intention of the testator not to give the property itself, but to place the title forever in abeyance, and to preserve the property as "his general estate," that comment on it is unnecessary.

The language used by the present Chief Justice of Louisiana, with reference to the will of Henderson, is equally applicable to that now under discussion: "There is not a word in the will that takes the ownership out of his succession; but that, if carried into effect, it takes it out of commerce is indisputable." He expressly orders, "it is to remain forever as a part of my succession." The executors might lease, but they could not sell. Henderson *v.* Rost, 5 Annual, 458.

VI. The will of McDonogh is in direct violation of the law of Louisiana, which prohibits perpetuities, and the placing of property out of commerce. Marthurin *v.* Livaudais, 5 Martins, N. S. 302; Cole *v.* Cole, 7 Martins, N. S. 416; Arnauld *v.* Tarbe, 4 La. Rep. 502; heirs of Henderson *v.* Rost, 5 Annual, 458; Franklin case, above cited.

And so strong is the determination of the Legislature to prevent property from being withdrawn from commerce, that it has expressly abrogated the former civil law, and the special article of the code of 1808, which prohibited the alienation of things holy, sacred, and religious. Code of 1808, pp. 95 and 96; 1 Strahan's Domat, § 129, 1435; Civil Code, 447. The will also violates the provision of the law which prohibits the testator

from ordering that property shall never be divided.  C. C. Art. 1222–3.

And, although under the terms of the law, such a prohibition is considered as not made, yet where the property is not given in ownership to the devisee, and the prohibition is inserted, with a view to carry out an entire scheme, created by the will, and which must fail if the prohibition be not enforced, then to allow the partition of the property between the devisees for their own use, becomes not an interpretation of the will, but a perversion of the whole design of the testator, and the making of a new will for him.   Henderson v. Rost, above cited.   See also Hawley v. James, 16 Wendell, 144, 180.

This consideration also disposes of the question raised specially in behalf of the Orphan Asylum.   The annuity is inseparably connected with the trust, and must fall with it; there is no possibility of upholding it when the trust on which it depends is overthrown.   It is to be paid from rents and profits which will never accrue.   Coster v. Lorillard, 14 Wendell, 265; same case, 5 Paige, Ch. Rep. 172; Hawley v. James, 16 Wendell, 180.

VII.  The beneficiary legatees of McDonogh, the asylum, the school farm, the free schools, are not in existence, nor is even the board of commissioners of his general estate, as a legal corporation, capable of holding property in succession.

They are intended by the testator to be corporations with perpetual succession, he has so declared in his will, and he has attempted to organize them as what he calls " institutions."

The power of creating corporations is a sovereign power, which no individual can usurp.   In Louisiana the legislature itself could not incorporate the institutions provided for by this will.   Constitution of 1845, Arts. 123, 124.

These articles prohibit the creation of any corporations by special charter, except political and municipal corporations, and provide that no corporation thereafter to be created, " shall ever endure for a longer period than twenty-five years."

The legislature, by act of 30th April, 1847, in obedience to these articles, passed a general law for the organization of such corporations as McDonogh desires to establish by his will, restricting their possession of property to a value of $300,000. Digest Louisiana Statutes, p. 181.

The whole scheme of McDonogh's will is in direct violation of the policy of Louisiana, as established by the constitution and this law, and is null and void for this reason.

Before the adoption of these articles of the Constitution, when the legislature granted special acts of incorporation to religious and charitable societies, its policy was equally marked

by restricting their possession of property and right to receive donations within narrow limits, and confining their duration to a term of years. Bullard and Curry's Digest, p. 343, Nos. 214, 221, p. 353, No. 241, p. 354, No. 248. First Congregational Church *v.* Henderson, 4 Rob. R. 215, where it appears that the church was prohibited from receiving from any single person by donation or legacy more than one thousand dollars.

It has long ago been held by this court, that a legacy to an association, not incorporated, could not be taken by it as a society, nor by the individuals who composed the association at the death of the testator. Baptist Association *v.* Hart, 4 Wheaton, 1. And the law of England on this point is well settled. Grant on Corporations, 115, 572.

The statute law of Louisiana is in conformity with these principles, and requires, for the validity of a legacy, two conditions: 1st. The existence of the legatee at the death of the testator; 2d. The capacity of the legatee to receive at the time, if the legacy be absolute; or if conditional, the capacity at the time of the fulfilment of the condition. Civil Code, 1469, 1460, 1459.

These provisions of the civil law are established with great clearness by the highest authorities. 5 Toullier, 99, No. 91—2; Pothier Donations Testamentaires, p. 361; Pothier, Obligations, Nos. 203, 208, 222; 2 Strahan's Domat, 3518, 3038; 3 Marcade, 430; 5 Zacharia, 23; 8 Duranton, No. 221; Coin Delisle, 96, No. 4.

And although the French code, which forms the basis of that of Louisiana, admits of exception, in cases of marriage contracts, to the rule requiring the existence of the donee at the date of the gift, the Louisiana code expressly forbids this exception, and repeats the prohibition. Code Napoleon, 906, 725; Civil Code, 947, 948, 1727.

It is true that, in one case in Louisiana, the court held a legacy valid to corporations not in existence. Milne's heirs *v.* Milne's executors, 17 La. Rep. 46.

But that case stands alone in the reports, and on the very face of the decision is self-contradictory. It is not the law of the land.

But even admitting its correctness, it was decided on the express ground that the corporations had been created by act of the legislature, immediately after the decease of the testator, and where this action of the legislature has been refused, it has since been held that the devise must fail. Heirs of Henderson *v.* Rost, 5 Annual 458, opinion of Preston, J.

Now in the case before the court, not only has the Legislature of Louisiana, no constitutional power to create the corporations in

question, but both the States of Louisiana and Maryland have declared their disapproval of the scheme of the will and denounced it as null and void, and contrary to public policy. Record, p. 67, 129; Act of Legislature of Louisiana, 12th March, 1852, p. 132; Resolution at Legislature of Louisiana, 12th March, 1852, p. 136.

The corporations contemplated by McDonogh are, therefore, not only without present existence, but without any probability of future existence, and the property conveyed to them must of necessity fall to the heirs at law.

A case infinitely stronger in favor of the validity of a devise, was decided by the Supreme Court of the Hanseatic cities in favor of the heirs at law. It was the case of a legacy to the city of Frankfort, of a sum of money destined to the establishment of a museum of painting, for the direction and administration of which a society was to be created according to law, and as soon as it was incorporated, the society was to become the owner of the legacy, on condition of applying it to the use prescribed by the testator.

The decision of the court was, that the city could not keep the legacy without violating the intention of the testator; and that the society could not take it, because it had no legal existence at the date of the testator's death. The legacy was therefore annulled in favor of the legal heirs. Roshirt, Ueber den Standelschen Erbfolge, 1828; Muhlenbruck, Beurtheilung des Stadelschen Beerbungsfalles.

And if the dispositions of McDonogh's will be indeed as we maintain in favor of corporations not yet in existence, and therefore incapable of taking, the Code of Louisiana provides that they shall be null, notwithstanding the interposition of the names of the cities, which is a mere device of the testator to shield them from the law.

" Every disposition in favor of a person incapable of receiving shall be null, whether disguised under the form of an onerous contract or made under the name of a person interposed." C. C. 1478.

VIII. The schools which the testator requires to be established in Louisiana are in contravention of the policy of the State, as established by its constitution and laws.

The will requires that the benefit of the schools shall be confined to the poor, as a class. The constitution and laws of Louisiana require that free schools shall be established and kept under the supervision of public officers, where all white children alike, the rich and poor, may be educated by the same teachers, and on terms of equality.

Free schools confined to the poor alone give rise to distinc-

tion of classes in the community, are antirepublican in tendency, and conflict with the policy of the State. Constitution of La. articles 133 – 4; Acts of Legislature of La. 1841, Digest, p. 239; Acts of Legislature of La. 1847, Digest Laws of La. 228 *et seq.*

And free schools in which poor white and colored children are to be received indiscriminately, and placed on an equality, would be intolerable in States where slavery is recognized as a legal institution.

IX. If it be held that the city of New Orleans can take the trust estate bequeathed to it, the executors must be ordered to account to complainants for the half which is devised to the city of Baltimore.

The trust in favor of that city is to be there executed under the laws of Maryland. By that law the trust in question is void. It cannot be there executed, because the object is not definite.

" Whenever the word poor or poorest has been used as a term of description in a devise or bequest, it has been held to be insufficient for uncertainty." Dashiell *v.* The Attorney-General, Harris & Johns. 399.

The devise to the school farm in McDonogh's will is " for the express and sole purpose of establishing a school farm on an extensive scale for the destitute and the poorest of the poor male children, &c." Record, p. 18. And " for rescuing from vice and ignominy millions upon millions of the destitute youth, &c." Page 22.

The general devise is " for the establishment and support of free schools wherein the poor, and the poor only, of both sexes, of all classes and castes of color, shall have admittance, free of expense." Page 14. Schools for " the poorer classes, for whom these institutions are alone intended," (page 27,) " where every poor child and youth, of every color, may receive a common English education." Page 29.

Such trusts are incapable of execution, according to the concurrent decisions of the highest courts of Maryland. Trippe *v.* Frazier, 4 Harris & Johnson, 446; Dashiell *v.* Attorney-General, 5 Id. 398; Dashiell *v.* Attorney-General, 6 Id. 1; Tolson *v.* Tolson, 10 Gill & Johns. 159; Meade et al. *v.* Beale & Latmer, executors of Ford, decided by Chief Justice Taney, in U. S. C. C., November term, 1850.

These decisions are in strict pursuance of those of the English courts, in cases quite as strongly appealing to good feeling as any of those termed charitable. Ram on Legal Judgment, ch. 19, § 2, in 9th vol. Law Library, and cases there cited.

And this court has more than once determined, " that the

common law of each State must be ascertained by its general policy, the usages sanctioned by its courts, and its statutes; and there is no object of judicial action which requires the exercise of this discrimination more than the administration of charities." Wheeler *v.* Smith, 9 How. 78; Baptist Association *v.* Hart, 4 Wheaton, 27; Inglis *v.* Sailors' Snug Harbor, 3 Peters, 112; Vidal *v.* Girard's Executors, 2 Howard, 129.

And if the trust is incapable of execution in Maryland, though valid in Louisiana, the property falls to the legal heirs. Hawley *v.* James, 7 Paige, Ch. Rep. 213; S. C. 5 Paige, Ch. Rep. 323, 441; S. C. 16 Wendell, 61.

So in England it has been held that where a trust was created in personal property abroad, to be invested in lands in England, contrary to the policy of her mortmain laws, the devise is void. Attorney-General *v.* Mills, 3 Russell, R. 328.

The right of Baltimore to accept such a trust is a question of personal capacity, to be governed by the law of the domicil, according to principles of law universally admitted. Story's Conflict, § 51, 65, 446.

X. The residuary devises to the States of Louisiana and Maryland are the same in their nature and character as those to the cities of New Orleans and Baltimore. They are trusts "That the legislatures of those States, respectively, may carry my intentions, as expressed in this my last will and testament, into effect, as far and in the manner which will appear to them most proper" (p. 29); and this trust is followed by the reiteration of his purpose in the strongest terms he could discover: "For this purpose, and this only, my desire being that one dollar shall never be expended to any other purpose, I destine the whole of my general estate to form a fund in real estate, which shall never be alienated, but be held and remain forever sacred to it alone."

The qualification in the devise to the States merely gives a discretionary power as to the mode of execution of the purpose; it enables them to dispense with such of the machinery of administration of the trust as they might find cumbersome or ill adapted to the object in view, but it is subordinate to the chief illegal conditions of the scheme, and does not admit of its fractional observance. It gives a latitude as to the administration and machinery of the purposes subject to the proviso that these purposes are to be observed, viz. 1st, the education of the poor of the two cities in preference to all others; and, 2d, that this be done by the revenues of a fund formed of inalienable real estate. Morrice *v.* Bishop of Durham, 9 Vesey, 399; Briggs *v.* Penny, 8 Eng. Law and Eq. 234–5; Morrice *v.* Bishop of Durham, 10 Vesey, 521; Story's Eq. Juris, § 979, a. b.; Wheeler *v.* Smith, 9 Howard, 55; Adams's Eq. 134, Am. ed.

Mr. Justice CAMPBELL delivered the opinion of the court.

The appellees are the heirs at law of John McDonogh, a native of the State of Maryland, who died at McDonogh, near New Orleans, in the State of Louisiana, in 1850, leaving there a very large succession. In 1839, the decedent executed, at New Orleans, an olographic will for the disposal of the estate he might have at his death. This will is in a legal form, and has been admitted to probate in the District Court of New Orleans. It contains two particular legacies which are not contested, and a single legacy under a universal title. In this bequest the testator declares, "that for the more general diffusion of knowledge, and consequent well being of mankind," and "being convinced that he could make no disposition of those goods which the Most High had placed under his stewardship, as by means of which the poor will be instructed in wisdom and led into the path of holiness," "he gives, wills, and bequeathes all the rest, residue, and remainder of his estate, real and personal, present and future, as well that which was then his as that which he might acquire at any time before his death, and of which he might die possessed, (subject to certain annuities,) to the corporations of the cities of New Orleans and Baltimore forever, one half to each," "to and for the several intents and purposes thereafter declared." The testator directs his executors to convert his personal estate into real property, whereby "the whole of his estate will become a permanent fund in real estate, affording rents, no part of which shall ever be touched, divided, sold, or alienated, but shall forever remain together as one estate, and be managed" as he shall order.

For the management of this estate, thus declared to be inalienable, he directs the two cities each to select, annually, three agents, whose duty it should be to receive seisin and possession of the estate from his executors, immediately after his death. They are "to lease or rent the lots," "cultivate the plantations," "collect the rents," "pay the annuities," "invest the moneys," and, "in fine, do all acts necessary to its full and perfect management, according to the will;" the will of the testator being "that no part of the general estate, or revenue from rents arising from said general estate, shall go into the hands of the corporate authorities of the said cities, but that the said authorities should have forever the supervision of it."

The testator designed the joint management of the agents of the cities, and the joint supervision of their authorities over the estate, to be perpetual. He forbids the cities to vary, by agreement, or by any compromise, the relations he has established between them in regard to it. They must make no sale of their interests; no traffic with their powers of control; no surrender,

Executors of McDonogh et al. *v.* Murdoch, et al.

for money or other consideration, of their supervisory care. But should they combine to violate his scheme of management or appropriation, their rights are declared forfeited, and "the general estate" is limited over to the States of Louisiana and Maryland, "for the purpose of educating the poor of those States," "under such a general system of education as their legislatures should appoint." He further provides, that should there be "a lapse of the legacies from the failure of the legatees to accept, or any other cause or means whatsoever," the shares should inure for the benefit of the State or States in which the cities are situate; "that the legislatures of those States respectively may carry his intentions, as expressed and set forth in the will, into effect, as far and in the manner which will appear to them most proper."

The testator having provided for the perpetuity of the Mc-Donogh estate, and the destination of its revenues, proceeds to develop a minute and detailed scheme for its management, improvement, and the expenditure of its income. He appropriates one eighth part of its annual revenue, for forty years, for colonizing the free people of color, to the American Colonization Society, the sum not to exceed $25,000 per annum; one eighth part for the erection, in New Orleans, of an asylum for the poor of all ages, castes, and colors; one eighth part to an incorporated society for the relief of orphan boys in New Orleans; and one eighth part for the establishment of a school farm in Maryland. The money appropriated to the asylum, school farm, and orphan boys, he requires to be invested as capital in real estate, and the rents only to be subject to the uses of the donees. The capital of the asylum and school farm is to be entirely collected, before any appropriation takes place for their use; and for the one the capital is to be $3,000,000, and for the other $600,000. The remaining four eighths of the income of the general estate, for the present, and the whole, after the objects above mentioned are fulfilled, are destined "for the education of the poor, without the cost of a cent to them, in the cities of New Orleans and Baltimore, and their respective suburbs, in such a manner that every poor child and youth, of every color, in those places, may receive a common English education—based, however, be it particularly understood, on a moral and religious one;" the whole of the general estate "to form a fund in real estate which shall never be sold or alienated, but be held and remain forever sacred."

To carry his purposes into effect, he directs the selection of boards of managers for the different establishments, and suggests that acts of incorporation may become necessary to facilitate their operations.

34 *

The appellees claim, that, as to the property embraced in this bequest to the cities, that John McDonogh died intestate.

Their argument is, that although he makes in the commencement of his will a formal gift to the cities; although the cities are designated as his legatees in several clauses of the will, in precise terms; although the property is described as property "willed and bequeathed to the cities," that the testator has sedulously contrived to withdraw from them the seisin and possession of the whole estate, and has committed them to an uncertain and fluctuating board, for the selection of which he has provided; that the dominion and use of this property, in so far as he has permitted either, has been confided to this board of managers, but that this board is held servilely to a code of regulations he has dictated, the aim of which is to hold the "McDonogh estate" together in perpetuity; that by these restrictive regulations the donations to the cities have become nugatory and unavailing.

This conclusion was adopted by the Circuit Court, whose decree is under revisal, and has been sustained in the argument at the bar of this court with great power and ability.

We may remark of the will of the testator, that it indicates his imagination to have become greatly disturbed by a long and earnest contemplation of plans which he says "had actuated and filled his soul from early boyhood with a desire to acquire a fortune, and which then occupied his whole soul, desires, and affections." In the effort to accomplish these cherished hopes he has overstepped the limits which the laws have imposed upon the powers of ownership, overlooked the practical difficulties which surround the execution of complex arrangements for the administration of property, greatly exaggerated the value of his estate; and unfolded plans far beyond its resources to effect; and has forgotten that false calculations, mismanagement, or unfaithfulness might occur to postpone or prevent their attainment. Holding and declaring a firm faith in the interposition of Providence to render his enterprise successful, he apparently abandons himself, without apprehension or misgiving, to the contemplation of the "McDonoh estate," as existing through all time, without any waste or alienation, but improving and enlarging, "extending the blessings of education to the poor through every city, town, and hamlet" of the State where he was born, and the State in which he had lived and was to die; "rescuing from ignorance and idleness, vice and ignominy, millions upon millions of the destitute youth of the cities," and "serving to bind communities and States in the bonds of brotherly love and affection forever."

The exaggeration which is apparent in the scheme he projects,

and the ideas he expresses concerning it, afford the ground of the argument for the appellees. It is, however, unfair to look to the parts of the will which relate to the disorders which reign in society, or to his aspirations to furnish a relief for these "during all time," or to the prophetic visions awakened by the exalted and exciting ideas which dictated the conditions of the will, for the rule of its interpretation. We must look to the conveyances he has made in the instrument, the objects they are fitted to accomplish, and the agencies, if any, to be employed, and endeavor to frame these into a consistent and harmonious plan, accordant with his leading and controlling intentions. In reference to his controlling purpose there can be no mistake. He says, "that the first, principal, and chief object" in his view is "the education of the poor" of the two cities. With equal emphasis and precision he has disclaimed the desire of building the fortunes of his natural relations. He says, "that even to his children, if he had them, (as he has not,) and a fortune to leave behind him, he would, besides a virtuous education, to effect which nothing should be spared, bequeathe to each but a very small amount, merely to excite them to habits of industry and frugality, and no more."

His ruling purpose had no connection with the poor of any one generation. His desire was to establish a foundation to exist for all time — a perpetuity.

He knew that to attain this purpose a succession of persons, animated with a corresponding aim, must be obtained, and that the legal capacities of voluntary associations, even if he could hope to find such to enter into his plans, were wholly unfitted for his design; nor did he hope to effectually combine such persons by any power or prayer of his own. Hence, he selected as his devisees bodies corporate, endowed with the faculties of acquiring and holding property, having determinate ends and abiding agencies to be employed in accomplishing them. These were all requisite for the full attainment of the purposes he has declared.

He excludes, it is true, the municipal authorities from the particular management of the estate, or the application of its revenues.

But, the municipal officers are not his legatees. They are themselves but agents clothed with a temporary authority; nor do the officers perform their executive duties, except by the interposition of agents subordinate to their control and subject to their supervision. Had the testator confined himself to an unconditional donation of the general estate to the cities, for the use of public schools, it would scarcely have fallen under the personal management of the corporate authorities. They would

probably have appointed boards or agencies, to whom powers, more or less general, would have been confided, and over whose conduct their supervision would have been more or less particular and exact. The knowledge of this probably induced the testator to describe the board which his experience and observation had marked as the most efficient and responsible. He defines their number, the manner of their appointment, the form of their accounts, the modes of their business, and urgently exacts that the great, and to his eyes sacred, interests of his charity should not be blended with the vulgar and debauching concerns of daily corporate management. These directions must be regarded as subsidiary to the general objects of his will, and whether legal and practicable, or otherwise, can exert no influence over the question of its validity. Nor do we esteem the facts, that he has given his estate a name, regards it as a distinct entity, and couples with it language denoting perpetuity, important as evidence that the cities are not his legatees. A gift to a municipal corporation tends to create a perpetuity. Property thus held ceases to be the subject of donation, or of devise, of transfer by bankruptcy, or in the order of succession. The property of such a corporation is rarely the subject of sale, and practically it is out of commerce. McDonogh supposed that he could prohibit any alienation or division. We do not perceive, therefore, why he should have sought an incorporation of the general estate; nor do we understand that this forms a prominent portion of his scheme.

The will, through every part, discloses that the cities are the particular objects of his interest; and the poor of the cities of his providence and bounty. His will designates the cities, by their corporate name, as his legatees, in definite and legal language. His plan of administration is to be executed through agents, selected by their corporate authorities, and to the end of conveying to the poor of the cities, perpetually, the fruits of his property. We should violate authoritative rules of legal interpretation, were we to disinherit the cities under these circumstances, and to substitute for them " an ideal being" called the " general estate," having no legal capacity, nor juridical character, and whose recognition, therefore, could have no result but to overturn the will of the testator. C. C. 1706; 1 Spence, Eq. J. 529, 530; 5 Ann. R. 557.

Having thus determined that the legacy is to the cities by a universal title, and, having extracted from the will the leading and controlling intention of the testator, the next inquiry is, whether a legacy given for such objects is valid.

The Roman jurisprudence, upon which that of Louisiana is founded, seems originally to have denied to cities a capacity to

inherit, or even to take by donation or legacy. They were treated as composed of uncertain persons, who could not perform the acts of volition and personalty involved in the acceptance of a succession. The disability was removed by the Emperor Adrian in regard to donations and legacies, and soon legacies *ad ornatum civitatis* and *ad honorem civitatis* became frequent. Legacies for the relief of the poor, aged, and helpless, and for the education of children, were ranked of the latter class. This capacity was enlarged by the Christian emperors, and after the time of Justinian there was no impediment. Donations for charitable uses were then favored; and this favorable legislation was diffused over Europe by the canon law, so that it became the common law of Christendom. When the power of the clergy began to arouse the jealousy of the temporal authority, and it became a policy to check their influence and wealth — they being, for the most part, the managers of property thus appropriated — limitations, upon the capacity of donors to make such gifts, were first imposed. These commenced in England in the time of Henry III.; but the learned authors of the history of the corporations of that realm affirm, that cities were not included in them — "perhaps upon the ground, that the grants were for the public good;" and, although "the same effect was produced by the grant in perpetuity to the inhabitants," "the same practical inconvenience did not arise for it, nor was it at the time considered a mortmain." Mereweth. & Steph. Hist. Corp. 489, 702.

A century later, there was a direct inhibition upon grants to cities, boroughs, and others, which have a perpetual commonalty, and others "which have offices perpetual," and, therefore, "be as perpetual as people of religion." The English statutes of mortmain forfeit to the king or superior lord the estates granted, which right is to be exerted by entry; a license, therefore, from the king severs the forfeiture. The legal history of the Continent on this subject does not materially vary from that of England. The same alternations of favor, encouragement, jealousy, restraint, and prohibition, are discernible. The Code Napoleon, maintaining the spirit of the ordinances of the monarchy, in 1731, 1749, 1762, provides "that donations, during life or by will, for the benefit of hospitals of the poor of a commune, or of establishments of public utility, shall not take effect, except so far as they shall be authorized by an ordinance of the government."

The learned Savigny, writing for Germany, says: "If modern legislation, for reasons of policy or political economy, have restrained conveyances in mortmain, that those restrictions formed no part of the common law." The laws of Spain

contain no material change of the Roman and ecclesiastical laws upon this subject. The Reports of the Supreme Court of Louisiana (in which State these laws were long in force) attest their favor to such donations. De Pontalba *v.* New Orleans, 3 Ann. 660.

This legislation of Europe was directed to check the wealth and influence of juridical persons who had existed for centuries there, some of whom had outlived the necessities which had led to their organization and endowment. Political reasons entered largely into the motives for this legislation — reasons which never have extended their influence to this continent, and, consequently, it has not been introduced into our systems of jurisprudence. 2 Kent's Com. 282, 283; Whicker *v.* Hume, 14 Beav. 509.

The precise result of the legislation is, that corporations, there, with the capacity of acquiring property, must derive their capacity from the sovereign authority, and the practice is, to limit that general capacity within narrow limits, or to subject each acquisition to the revisal of the sovereign. We have examined the legislation of the European states, so as better to appreciate that of Louisiana. No corporation can exist in Louisiana, have a public character, appear in courts of justice, exercise rights as a political body, except by legislative authority; and each may be dissolved, when deemed necessary or convenient to the public interest. Corporations created by law are permitted to possess an estate, receive donations and legacies, make valid obligations and contracts, and manage their own business. Civil Code, tit. 10, c. 1, 2, 3, art. 418, *et seq.*

The privileges which thus belong to corporations legally existing, have been granted to the inhabitants of New Orleans in various legislative acts. The authorities of the city have, besides, received powers of government extending to all subjects affecting their order, tranquillity, and improvement. It is agreed, that these powers are limited to the objects for which they are granted, and cannot be employed for ends foreign to the corporation. 1 Paige, 214; 15 New H. 317; 4 S. & S. C. R. 156; 3 Ann. 294.

But there can be no question as to the degree of appreciation in which the subject of education is held in Louisiana. The constitution of the State imposes upon the legislature the duty of providing public schools for gratuitous education; and various acts attest the zeal of that department in performing that public duty. Among these, there is one which authorizes and requires the corporate authorities of the city of New Orleans to establish them in that city, and to enact ordinances for their organization, government, and discipline; they are likewise

charged with the instruction, education, and reformation of juvenile delinquents and vagrants. These acts are from a sovereign authority, and endue the city with the powers of acquiring, retaining, and disposing of property, without limitation as to value, and assign to it, as one of its municipal functions, the charge of popular education. No parliamentary grant or royal license in Great Britain — no government ordinance in France — could remove more effectually a disability, if one existed, or create a capacity, if one were wanting, to the corporations of those countries. Rev. Stat. La. 41, 111, 116, 117, 144, 239; 2 Rob. 244, 491.

We shall now examine the devise to the cities, in connection with the various conditions annexed to it. The appellees insist it is a disposition reprobated by law, for that it contains " substitutions and *fidei commissa*," which are prohibited by article 1507 of the code, and which annul the donation in which they are found.

We shall not inquire whether the prohibition extends to donations in favor of corporations, and for objects of public utility, though this seems to have been a question in France. Lefeb. des Don. Pieuses, 31, 33.

We shall limit the inquiry to the nature of the prohibited estates, to determine whether they exist in this legacy. The terms are of Roman origin, and were applied to modes of donation by will, common during its empire, and from thence were transferred to the derivative systems of law in use upon the continent of Europe. The substitute was a person appointed by the testator to take the inheritance, in case of the incapacity or refusal of the instituted heir. A *pater familias* was authorized to make the will of his son during his nonage, or lunacy, or other incapacity to perform the act; and in the case of his death, under such circumstances, the appointee took the succession. This was a mode of substitution.

The *fidei commissum* originated in a prayer, petition, or request, of a testator upon his instituted heir, to deliver the inheritance, or some portion of it, to a designated person. Every testament being originally a law of succession, proposed by the testator, and consented to by the Roman people, the language of legislation, that is, of mandate and authority, was essential to its validity. Precatory words were insufficient to raise an obligation upon the heir, or to vest property in the donee. This was afterwards changed, and words of request then imposed a charge upon the heir, to maintain the faith in which the testator had confided. Afterwards, the distinctions between words of mandate and of request became obsolete, and both were considered with reference to their significance of the intentions of

the testator. The notion of a *fidei commissum* thus became limited, implying no more than an estate in possession, encumbered with the charge to surrender it to another. This might be pure and simple — that is, the duty to surrender might be immediate, or it might be on a condition, or after the expiration of a term even extending to the life of the *gravatus*. The substitute originally came in the place of another; the idea was modified to include those who came after another under certain circumstances.

The conjunction of the *fidei commissum* with the substitution would then become a natural mode of settlement of property. The instituted heir might be charged to hold and enjoy the succession for his life, and at his death that it should go to another, (his heir,) and that heir might in turn become a *gravatus*, for the benefit of another successor, and so from generation to generation.

Such a substitution might be properly called a " substitution-*fidei commissaire*," or an " oblique substitution." This mode of limiting estates from degree to degree, and generation to generation, was much employed on the continent of Europe, and served to accumulate wealth in a few families at the expense of the interests of the community. The vices of the system were freely exposed by the political writers of the last century, and a general antipathy awakened against it. Substitutions having this object were prohibited during the revolution in France, and that prohibition was continued in the Code Napoleon, whose authors have exposed with masterly ability the evils which accompanied them. Motifs et Dis. 375.

This prohibition was transferred to the code of Louisiana, with the addition of the *fidei commissa*. These terms imply a disposition of property through a succession of donees. The substitution of the article 1507 of the code being an estate for life, to be followed by a continuing estate in another by the appointment of the testator.

The *fidei commissa* of the Louisiana Code are estates of a similar nature, implying a limitation over from one to another. They are the *fidei commissa* of the Spanish and French laws, in so far as those estates are not tolerated by other articles of the code. We shall not attempt to define them from an examination of the code and the reports of the Supreme Court of that State. It is not necessary for the decision of this case. We are unable to perceive any thing in the code to justify the supposition that the English system of trusts, whether in its limited signification as applied in conveyancing, or in its broad and comprehensive import, as applied by the courts of chancery, were within the purview of the authors of this code in framing

this prohibition. The terms substitution and *fidei commissa* are words foreign to the English law. They are applied to no legal relation which exists in it, and describe nothing which forms a part of it. The technical words, of " charged to preserve and to render," in article 1507, which embrace so much to a continental lawyer, only provoke inquiries in the mind of one accustomed to the language of the common law. The allusion to the " Trebillianic portion" is to a right of which there has never been a counterpart in the English system. The whole article refers exclusively to things of a continental origin. The estates known as *fidei commissa* and substitutions, in so far as regards the , order of persons and the duration of their interest, may be created by devise in an English will. This can be done without the interposition of trustees or with them. That is, legal estates or equitable estates can be limited to embody those conditions of the *fidei commissa* and substitution; but the separation of the same estate into, parts, legal and equitable, with separate courts in which their respective qualities may be represented, is not of continental origin. We may say of this as Sir William Grant says of another doctrine of equity, " that in its causes, its objects, its provisions, its qualifications, and its exceptions, it is a law wholly English." We find nothing of the *fidei commissa* or substitution in the legacy to the cities. The mischiefs resulting from conveyances in mortmain, and which led to restraints upon them, also existed in the substitutions of the French law, and led to their suppression. The remedies for the mischief, in consequence of the difference of the persons, were essentially variant. In the case of natural persons, the abrogation of the capacity to limit property from successor to successor, and generation to generation, removed the evil of perpetuities. But no statute against estates tail, or of remainder, or reversion, operate upon a corporation. The mischief results from the duration of the corporation and the tenacity with which, from its nature, it holds to property. The fee-simple estate to a corporation is that which most effectually promotes the creation of a perpetuity. The remedy in Europe in this case was to restrict the number of corporations, and to reserve an oversight of their acquisitions to the sovereign authority. This precaution was taken, as we have seen, also in Louisiana. If she has granted to her metropolis an unrestricted license to acquire and to hold property, we must conclude there were sufficient motives to justify the act.

Our next inquiry will be, whether the testator is authorized to define the use and destination of his legacy. We have seen that donations to the cities of the Roman empire followed immediately upon the *senatus consultum* which allowed them ·to

take, and that the destination of such donations to public uses was declared. Domat says, "One can bequeathe or devise to a city or other corporation whatsoever, ecclesiastical or lay, and appropriate the gift to some lawful and honorable purpose, or for public works, for feeding the poor, or for other objects of piety or benevolence." Domat, Lois Civiles, b. 4, tit. 2, § 2.

The city of New Orleans holds its public squares, hospitals, levees, cemeteries, and libraries by such dedications. This court says, (New Orleans *v.* United States, 10 Peters, 662,) "That property may be dedicated to public use, is a well-established principle of the common law. It is founded in public convenience, and has been sanctioned by the experience of ages. Indeed, without such a principle, it would be difficult, if not impracticable, for society, in a state of advanced civilization, to enjoy those advantages which belong to its condition, and which are essential to its accommodation."

The Supreme Court of Louisiana, in a number of cases, have applied the principle contained in these citations with confidence. DePontalba *v.* New Orleans, 3 An. 662; Will of Mary, 2 Rob. 440; Duke of Rich. *v.* Mylne, 17 La. 312; Maryland and Louisiana *v.* Roselius, MS.

The code of Louisiana provides that donations made for the benefit of an hospital, of the poor of the community, or of establishments of public utility, shall be accepted by the administrators of such establishments. C. C. 1536. It may be very true this article relates merely to the formal manner by which donations, *inter vivos*, for such objects may be perfected; but it will be observed that the requirement of the French Code of a government license for the gift is dispensed with in the frame of this article, and a strong implication arises from its terms in favor of the validity of such gifts. An acceptance of such donations in a will is unnecessary. Nor do we see any ground for inferring a prohibition of donations by will, which are lawful, *inter vivos*, in the absence of any prohibitive article in the code. We are of the opinion, therefore, that the testator might declare the uses to which he destined his legacy to the cities; and the destination, being for purposes within the range of the powers and duties of its public authorities, is valid.

We shall now examine the question, whether the conditions annexed to this legacy, the prohibition to alienate or to divide the estate, or to separate in its management the interest of the cities, or their care and control, or to deviate from the testator's scheme, invalidate the bequest.

The appellees contend that the performance of these conditions is impossible; they are contrary to public policy; introduce tenures at variance with the laws; and would result in mischief

to the State. That the conditions are of the essence of the gift, and the will would not conform to the dispositions of the testator, if they should be erased or disregarded. They insist that the appellees take by virtue of the law, but the devisees claim under a will. That, if they cannot exhibit a clear and valid devise of the property, the legal right of the heir should not be defeated. That this court cannot, under the guise of judicial construction, sanction an instrument from which the main prescriptions of the testator are obliterated.

The argument on this point against the cities possesses great logical force. It is admitted that illegal or immoral conditions will vitiate a contract, (C. C. 2026); but the code provides that, "in all dispositions *inter vivos* and *mortis causa*, impossible conditions, those which are contrary to the laws or to morals, are reputed not written." The authorities cited establish that, under the word "conditions," the various modes of appropriation, use, and destination attached to this legacy are included. Merlin says, " Conditions take different names according to their object; they are called in turn charges, destinations, motives, designations, terms. But although the conditions, charges, destinations, &c., &c., ought to be distinguished, nevertheless the word condition often serves to express them all." Merlin's Rep. Cond. § 2.

The signification of this article of the code becomes then an important inquiry. It is found in the Digest of Justinian, and from thence passed into the codes of France and Spain. Touil. 5, No. 255; 1 Escrich. Dic. leg. 565. It was copied from the Code Napoleon into the Code of Louisiana. Savigny furnishes us with the history of the law as found in the Pandects. One of the schools into which the Roman jurisconsults was divided (Proculeians) placed the construction of contracts and testaments, containing illegal or impossible conditions, on the same principle, and insisted that the whole disposition in each should be vitiated by them; another (Sabinians) changed the rule with reference to the instrument, and, while contracts were vitiated by the illegal or immoral conditions, in wills the conditions only were pronounced nugatory. Justinian adopted the opinion of the latter, which seems to have been preferred in practice before; and his adoption has been regarded as a legislative sanction of their rule in favor of testaments. Great authorities in France oppose this doctrine, and in Prussia it exists, but in a modified form, while it has been wholly rejected in Austria. 5 Toul., No. 247; Savig. Rom. Law, § 122-3-4.

The common-law rule depends upon the fact, whether the performance of the illegal, immoral, or impossible condition is prescribed as precedent or subsequent to the vesting of the estate of the devisee. In the former case, no estate exists till

the condition is performed, and no right can be claimed through an illegal or immoral act. In the latter case, the estate remains, because it cannot be defeated as a consequence of the fulfilment of an illegal or immoral condition. This, however, applies only to devises of real estate; for the ecclesiastical and chancery courts, in regard to bequest of personalty, follow the rule of the civil law, as above expressed. 1 Rop. Leg. 754–5; 7 Beav. 437; 1 Eden, R. 140; 2 Spence, Eq. J. 229.

The conditions in the case before us, which impose restraints upon alienation and partition, and exact a particular management through agents of a specified description, are conditions subsequent, and would not, by the rule of the common law, divest the estate, if pronounced to be illegal or immoral. 3 Pet. S. C. R. 377; 1 Sim. R. N. S. 464; 7 E. L. & Eq. 179; 2 J. C. Scott, C. B. R. 883; 2 Zabriskie R. 117; 10 Ala. R. 702.

These conditions belong, too, to the class that are reprobated as repugnant to the legal rights which the law attaches to ownership. The common law pronounces such conditions void, in consequence of that repugnancy, and the civil law treats them as recommendations and counsel, not designed to control the will of the donee. 1 Rop. Leg. 785; 4 Kent's Com. 130; Toul. 5, No. 51; Id. No. 405; Dalloz. Dic. tit. Cond. 96; 10 E. L. & E. R. 23.

Our opinion upon the article of the code we have cited is, that it does not prescribe a rule of interpretation, to aid the understanding of the courts in finding the intention of the testator, but that it is a peremptory enactment of the legislative authority, applicable to the subject-matter in all cases, without reference to any declared or presumed intentions of the author of a particular donation. The code treats such conditions in contracts as the wrong of both the parties, and annuls the act. In the case of the testament, while it refuses to allow the condition, it saves to the innocent legatee the disposition in his favor. It may be that this is done on the presumption that, independent of the condition, the legatee is the favorite of the testator, or from a consideration of the legatee alone. Savigny Rom. Law, § 122, *et seq.*

We have thus far treated the cities as occupying an equal position, and have considered the case with reference to the city of New Orleans alone.

The city of Baltimore is legally incorporated, and endowed with the powers usually granted to populous and improving cities. The General Assembly of Maryland, in 1825, authorized the city to establish public schools, and to collect taxes for their support; and, in 1842, it was empowered to receive in trust, and to control for the purposes of the trusts, any property which

might be bestowed upon it, by gift or will, for any of its general corporate purposes, or in and of the indigent and poor, or for the general purposes of education, or for charitable purposes of any description whatsoever, within its limits. The legal capacity of the city, therefore, corresponds with that of the city of New Orleans. Do the laws of Louisiana make a discrimination?

The code declares, " that all persons may dispose of or receive by donations, inter vivos or mortis causa, except such as the law declares expressly incapable." C. C. 1456. There is no distinction between corporations and natural persons in the power to receive by donation, nor do we find any discrimination between domestic and foreign corporations, except, perhaps in a single article. " Donations may be made in favor of a stranger, when the laws of his country do not prohibit similar dispositions in favor of a citizen of this State." C. C. 1477.

We greatly doubt whether this article applies to all the citizens or corporations of the States of the Union. The constitutional relations between the citizens of the different States are those of equality, in reference to the subject of this article. This court, in the case of the Bank of Augusta v. Earle, (13 Pet. 520,) said, " that by the law of comity among nations, a corporation created by one sovereignty is permitted to make contracts in another, and to sue in its courts; and that the same law of comity prevails among the several sovereignties of the Union. This comity is presumed from the silent acquiescence of the State. Whenever a State sufficiently indicates that contracts which derive validity from its comity are repugnant to its policy, or are considered as injurious to its interests, the presumption in favor of its adoption can no longer be made.

These principles were applied to a purchase of lands by the corporation of one State in another. Runyon v. Coster, 14 Pet. 122.

The principles of these cases have been adopted in Louisiana. 4 Rob. La. R. 517; 17 La. R. 46, 312.

We know of no departure from these principles in Maryland, and do not doubt that the corporations of Louisiana would take in the same manner as those of Maryland in that State.

The question remains to be considered, whether the destination of the legacy to public uses in the city of Baltimore affects the valid operation of the bequest. All the property of a corporation like Baltimore is held for public uses, and when the capacity is conferred or acknowledged to it to hold property, its destination to a public use is necessarily implied. Nor can we perceive why a designation of the particular use, if within the general objects of the corporation, can affect the result; nor is there

35 *

any thing in the nature of the uses declared in this will which can withdraw from the legacy a legal protection.

Neither do we concede that the uses, being in a degree foreign to the State of Louisiana, impair the effect of the will. It is well settled that, where property is conveyed to a use which would be protected, if to be executed at home, in the absence of a prohibition, the conveyance would be valid if the execution were ordered to take place abroad. This question was considered by Mr. Justice Story, in the opinion prepared by him for the case of the Baptist Association *v.* Smith, published in 3 Pet. 486, 500.

He says, "there is no statute of Virginia making such bequests void; and, therefore, if against her policy, it can only be because it would be against the general policy of all States governed by the Common Law." He concludes: "there is no solid objection to the bequest, founded upon the objects being foreign to the State of Virginia." In the late case of Whicker *v.* Hume, (14 Beav. 509,) on appeal, (16 Jur. 391,) a bequest to trustees, to be appropriated in their absolute and uncontrolled discretion, for the benefit and advancement and propagation of learning in every part of the world, as far as circumstances will permit," was pronounced valid. We find nothing in the Code of Louisiana indicating a spirit less comprehensive or catholic; we shall not, therefore, infer the existence of a restriction where none has been declared. We are of the opinion, that the uses for which the testator has devised his estate to the city of Baltimore, are approved alike in the legislation of Louisiana and Maryland, and that the execution of them may be enforced in their courts.

We have considered the legacy without a reference to the annuities which the testator has charged upon it. It is only necessary for us to determine a single question in regard to them. Are the heirs at law interested in the question of their legality?

The Civil Code (C. C. 1697) declares "that legatees under a universal title, and legatees under a particular title, benefit by the failure of those particular legacies, which they are bound to discharge."

It will be seen that all the annuitants, having a distinct character from the cities, have a claim upon them for their annual allowance. Should these annuities be invalid this charge would be removed, and the cities relieved. Such was the decision of the Supreme Court of Louisiana, (Prevost *v.* Martel, 10 Rob. 512,) and such the conclusion of the Court of Cassation, in Hanaire *v.* Tandon, the report of whose judgment is appended to one of the briefs of the appellants.

The annuities created to establish an Asylum for the Poor and a School Farm — and of the validity of which grave doubts exist — are charges upon the legacy of the cities. If the directions of the testator cannot be legally complied with, the charge will be remitted without defeating the legacy. Sav. Roman Law, § 120, 129.

We shall not express any decided opinion in reference to either of the annuities, but leave the question of their validity to be settled by the persons interested, or by the tribunals to whose jurisdiction they appropriately belong.

We have considered it to be our duty to examine the several questions which arise upon the record, so that the important interests involved in them may be relieved from further embarrassment and controversy. In our opinion, the failure of the devise to the cities would not have benefited the appellees; for that the limitation over to the States of Maryland and Louisiana would have been operative in that event.

We close our opinion with expressing our acknowledgments for the aid we have received from the able arguments at the bar, and the profound discussions in the Supreme Court of Louisiana, with whose judgment we have concurred.

The decree of the Circuit Court for the Eastern District of Louisiana is reversed, and the cause remanded to that court, with directions to dismiss the bill of the plaintiffs with costs.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs; and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to that court to dismiss the bill of the complainants, with costs in that court.